ENSINK v MECOSTA COUNTY GENERAL HOSPITAL

Docket No. 247220. Submitted April 15, 2004, at Grand Rapids. Decided June 17, 2004, at 9:10 A.M. Leave to appeal sought.

Gregory Ensink and Patricia Ensink brought a medical malpractice action in the Kent Circuit Court against Mecosta County General Hospital, Paul Rehkoph, M.D., and Michigan Emergency Physicians, LLP. The defendants moved for summary disposition, claiming that the plaintiffs failed to show that the failure to administer tissue plasminogen activator (t-PA) for the ischemic stroke suffered by Gregory Ensink more probably than not caused the plaintiff the loss of an opportunity to achieve a better result, and that the plaintiff's damages were too speculative. The court, Dennis C. Kolenda, J., determined that the plaintiffs, through the testimony of their expert witness, established a sufficient case for the likelihood of a better result necessary to survive defendants' motion. However, the court granted defendants' motion because the expert witness's testimony on damages was speculative. The plaintiffs appealed.

The Court of Appeals *held*:

1. The plaintiffs established that Gregory Ensink was paralyzed by an ischemic stroke and the paralysis was directly related to defendants' negligence, the failure to administer t-PA within three hours of the onset of the stroke. The only question is the amount of damages. With respect to damages, the plaintiffs were not required to establish damages with mathematical precision. Plaintiffs' expert testified that there would have been a better than fifty percent chance of some improvement in Mr. Ensink's condition had Mr. Ensink been given t-PA within the three-hour window of opportunity. The court erred when it granted summary disposition to the defendants on the basis that damages were speculative.

2. The circuit court erred when it concluded that the plaintiffs established that it was more probable than not that the failure to administer t-PA caused the plaintiff the loss of a greater than fifty percent opportunity to achieve a better result. MCL 600.2912a(2). This conclusion is reached only because, pursuant to MCR 7.215(J)(2), the majority decision in *Fulton v Beaumont Hosp*, 23

Mich App 70 (2002), must be applied. *Fulton* requires subtracting a *plaintiff's opportunity for a better result after a defendant's alleged* malpractice from the initial opportunity for a better result without the malpractice. Under that formulation, only if the loss of opportunity then exceeds fifty percent has a plaintiff met its burden pursuant to MCL 600.2912a(2). Plaintiffs' expert testified that the percentage opportunity for some improvement to a full cure with administration of t-PA was sixty-five percent and that without administration of t-PA, twenty percent of stroke victims would achieve a full cure. The lost opportunity is obtained by subtracting twenty percent from sixty-five percent. The result is a forty-five percent lost opportunity, which is less than the required fifty *percent lost opportunity needed to maintain the cause of action.*

3. Although the majority decision in *Fulton* must be applied in this case, MCR 7.215(J)(2), the *Fulton* dissent's interpretation of MCL 600.2912a(2) more accurately reflects the legislative intent in contrast to the majority's interpretation in that case. Particularly at the summary disposition stage, the statute only demands that a plaintiff show a fifty percent chance of achieving a better result before the alleged malpractice and that the alleged malpractice more probably than not reduced that opportunity of a better result.

Affirmed.

*Gruel, Mills, Nims & Pylman, LLP* (by *Norman H. Pylman* and *Brion J. Brooks*), for the plaintiffs.

*Smith Haughey Rice & Roegge* (by *William R. Jewell*) for Mecosta County General Hospital.

*Aardema, Whitelaw & Sears-Ewald, PLLC* (by *Robert B. Aardema*), for Paul Rehkoph, M.D., and Michigan Emergency Physicians, LLP.

Before: WHITE, P.J., and MARKEY and OWENS, JJ.

OWENS, J. Plaintiffs appeal as of right from the orders granting summary disposition to defendants in this medical malpractice lawsuit that were entered by the trial court pursuant to MCR 2.116(C)(10). We affirm the trial court on alternative grounds because we are re-

quired to do so by our previous decision in *Fulton v Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs[1] alleged[2] that at approximately 10:30 A.M. on July 15, 1998, plaintiff Gregory Ensink suffered an acute stroke.[3] Patricia Ensink called 911 and the emergency medical service (EMS) responded, but despite her request that they take plaintiff to Spectrum Health in Grand Rapids, EMS transported him to defendant Mecosta County General Hospital (Mecosta), which was closer. According to plaintiffs, Gregory arrived at Mecosta at 11:05 A.M. and was triaged at 11:20 A.M., after which he was taken to the emergency room. Plaintiff was examined by defendant Paul Rehkoph, M.D.,[4] an emergency room physician at Mecosta, who ordered a CT (computerized arial tomography) head scan. The scan was completed at 12:07 P.M. According to plaintiffs, the

---

[1] Patricia Ensink's sole claim was for loss of consortium; therefore, references in this opinion to "plaintiff" refer only to her husband, plaintiff Gregory Ensink.

[2] Because this case was disposed of by summary disposition, this recitation of facts is taken from the parties' pleadings and the witness depositions that were contained in the trial court file.

[3] According to defendants' brief in support of their motion for summary disposition, there are two types of stroke: ischemic, the type experienced by plaintiff, which occurs when a blood clot blocks a blood vessel in the brain and shuts off the oxygen flow to a portion of the brain, and hemorrhagic, which involves the rupture of a blood vessel in the brain.

[4] The doctor's name is spelled "Rehkoph" in the heading of the pleadings, but is spelled "Rekopf" in the body of the pleadings. This opinion will use the spelling used in the heading. Defendant Michigan Emergency Physicians, LLP, was alleged to be the employer of Dr. Rehkoph and was alleged to be liable under a theory of respondeat superior. Likewise, plaintiffs alleged that Dr. Rehkoph and Michigan Emergency Physicians were the agents or employees of Mecosta and that Mecosta was therefore liable under a theory of respondeat superior.

scan revealed that plaintiff's stroke was caused by a blood clot.

Plaintiffs alleged that Mecosta had available a supply of tissue plasminogen activator (t-PA)—a drug that had been approved by the Food and Drug Administration (FDA) for use in destroying blood clots in stroke victims. Plaintiffs contended that Dr. Rehkoph made two "major blunders": he failed to administer t-PA within the required three-hour window following the stroke and he failed to transfer plaintiff to Spectrum Health in a timely manner so that t-PA could possibly have been administered in that facility within the three-hour window. Plaintiffs claimed that a nurse at Mecosta asked Dr. Rehkoph if he intended to administer t-PA, but that he declined to do so. They further claimed that Dr. Rehkoph spoke with Dale McNinch, M.D., at Spectrum Health, who informed Dr. Rehkoph that "it appeared that [plaintiff] would be a candidate for t-PA and asked if they gave it to patients up there." Plaintiffs finally asserted that Eugene Wiley, M.D., a physician who practiced at Mecosta, was prepared to testify that he would have recommended administration of t-PA to plaintiff if he had been asked. According to plaintiffs, Dr. Wiley would also testify that t-PA is "the only thrombolytic treatment [] that [is] FDA-approved for treatment of ischemic stroke."[5]

Plaintiff was eventually transported to Spectrum Health, but he did not arrive until 2:16 P.M., after the three-hour window for the administration of t-PA had elapsed. Plaintiff alleged that because of defendants' negligence, he has suffered paralysis that has left him disabled and unable to work. Specifically, plaintiffs alleged that defendants were negligent and committed

---

[5] This Court was unable to find a copy of Dr. Wiley's deposition in the circuit court record or attached to any of the parties' briefs.

malpractice in a number of particulars. For the purposes of this appeal, the pertinent allegation of malpractice claimed that Dr. Rehkoph failed "to timely administer TPA [sic, t-PA] to Gregory Ensink within three hours of the onset of his symptoms."[6]

Mecosta moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiff had failed to demonstrate that the failure to administer t-PA more probably than not caused the loss of an opportunity to achieve a better result, and also claiming that plaintiff could not recover because his damages were too speculative. Defendants Dr. Rehkoph and Michigan Emergency Physicians filed a concurrence with Mecosta's motion for summary disposition.

Plaintiffs responded that the testimony of their expert witness, Steven Levine, M.D., established that it was more likely than not that administration of t-PA within the three-hour window would have had some effect on plaintiff's condition—although Dr. Levine could not estimate the extent of that effect. Plaintiffs also argued that, because Dr. Levine's testimony established defendants' liability, it was defendants' responsibility to "bear the burden of uncertainty as to the amount of damages."

The trial court concluded that plaintiffs had established a sufficient case regarding the likelihood of a better result to survive the summary disposition motion, but also concluded that summary disposition should be granted because, according to plaintiffs' expert's testimony, the damages were entirely speculative. Following the entry of orders granting summary dispo-

---

[6] Tissue plasminogen activator (t-PA) is a drug that is used to break up blood clots that occur in ischemic strokes. This drug is not used to treat hemorrhagic strokes. *New England Journal of Medicine*, Vol 333, No. 24, p 1581, (December 14, 1995).

sition and dismissing the case with regard to all defendants, plaintiffs have appealed as of right.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Smith v Globe Life Ins Co,* 460 Mich 446, 454; 597 NW2d 28 (1999). Defendants' motion for summary disposition was brought under MCR 2.116(C)(10). A C(10) motion tests the factual support of a plaintiff's claim. *Smith, supra* at 454. As summarized by our Supreme Court in *Quinto v Cross & Peters Co,* 451 Mich 358, 362; 547 NW2d 314 (1996):

> In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the affidavits or other documentary evidence show that there is no genuine issue in respect to any material fact, and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), (G)(4).

## III. SPECULATIVE DAMAGE CLAIM

Plaintiffs first contend that the trial court erred by concluding that their damage claim was too speculative. Plaintiffs argue that once their expert witness established the fact of plaintiff's injury by defendants' negligence and a range of possible damage, the uncertainty of the damages was something that had to be borne by defendants. Defendants counter that plaintiff's expert, Dr. Levine, admitted he could not say how much plaintiff's condition would have improved, only that it was

more likely than not that there would be "some improvement." Defendants have therefore claimed that damages are entirely speculative because, absent testimony concerning how much plaintiff's condition would have improved, there was no basis from which the jury could rationally estimate the amount plaintiff was damaged by the failure to administer t-PA.

"Recovery is not permitted in a tort action for remote, contingent, or speculative damages." *Theisen v Knake,* 236 Mich App 249, 258; 599 NW2d 777 (1999), citing *Law Offices of Lawrence J Stockler, PC v Rose,* 174 Mich App 14, 33; 436 NW2d 70 (1989). A more complete statement of this point of law was made in *Sutter v Biggs,* 377 Mich 80, 86-87; 139 NW2d 684 (1966):

> The general rule, expressed in terms of damages, and long followed in this State, is that in a tort action, the tort-feasor is liable for all injuries resulting directly from his wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and are such as, according to common experience and the usual course of events, might reasonably have been anticipated. Remote, contingent, or speculative damages are not considered in conformity to the general rule. *Van Keulen & Winchester Lumber Co v Manistee & Northwestern Railroad Co,* 222 Mich 682[; 193 NW 289 (1923)]; *Woodyard v Barnett,* 335 Mich 352[, 358; 56 NW2d 214 (1953)]; and *Fisk v Powell,* 349 Mich 604[, 613; 84 NW2d 736 (1957)]. See, also, *McLane, Swift & Co v Botsford Elevator Co,* 136 Mich 664 [99 NW 875 (1904)]; and *Cassidy v Kraft-Phenix Cheese Corp,* 285 Mich 426 [280 NW 814 (1938)].
>
> Further, to render a wrongdoer liable in damages in a tort action where the connection is not immediate between the injurious act and the consequences, such nearness in the order of events and closeness in the relation of cause and effect must subsist, so that the influence of the injurious act would predominate over that of other causes,

and concur to produce the consequences or be traceable to those causes. *Woodyard v Barnett, supra.*

Additionally, in *Wendt v Auto-Owners Ins Co,* 156 Mich App 19, 26; 401 NW2d 375 (1986), this Court cautioned that "questions of what damages might be reasonably anticipated is a question better left to the factfinder." In *Hofmann v Auto Club Ins Ass'n,* 211 Mich App 55, 108; 535 NW2d 529 (1995), this Court stated:

> A party asserting a claim has the burden of proving its damages with reasonable certainty. *S C Gray, Inc v Ford Motor Co,* 92 Mich App 789, 801; 286 NW2d 34 (1979). Although damages based on speculation or conjecture are not recoverable, *Sutter v Biggs,* 377 Mich 80, 86; 139 NW2d 684 (1966), damages are not speculative merely because they cannot be ascertained with mathematical precision. *Godwin v Ace Iron & Metal Co,* 376 Mich 360, 368; 137 NW2d 151 (1965). It is sufficient if a reasonable basis for computation exists, although the result be only approximate. *McCullagh v Goodyear Tire & Rubber Co,* 342 Mich 244, 255; 69 NW2d 731 (1955). *Moreover, the certainty requirement is relaxed where the fact of damages has been established and the only question to be decided is the amount of damages.* Bonelli v Volkswagen of America, Inc, 166 Mich App 483, 511; 421 NW2d 213 (1988). [Emphasis supplied.]

Similarly, in *Purcell v Keegan,* 359 Mich 571, 576; 103 NW2d 494 (1960), our Supreme Court observed:

> The trial court spoke, also, of "speculation" and "guess" as to the amount of overtime. But where injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, "in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable." Particularly is this true where it is defendant's own act or neglect that has caused the imprecision.

In this case, plaintiff established damage. He was paralyzed by an ischemic stroke that was directly related to defendants' negligence, the failure to administer t-PA within three hours of the onset of the stroke. Accepting plaintiff's allegations as true for the purposes of reviewing the grant of summary disposition, plaintiff has therefore established the fact of damages stemming directly from defendants' negligence, and it is only the amount of damages that is in question. *Hofmann, supra* at 108. The damages are therefore neither remote nor contingent and the degree of imprecision is that with which juries routinely must contend.[7]

The case relied on by the trial court, *Berrios v Miles, Inc,* 226 Mich App 470; 574 NW2d 677 (1997), is not applicable. Although the case states the general legal propositions already outlined, this Court concluded that the plaintiff's damages stemming from his infection with HIV (human immunodeficiency virus) by a contaminated blood source manufactured by the defendant were sufficiently established. It was because those damages were sufficiently shown that this Court decided that the plaintiff's cause of action had accrued and that this Court then reached the decision that he had failed to file his case before the statute of limitations expired. *Id.* at 480.

---

[7] Dr. Levine testified that it was more likely than not that there would have been "some improvement" if t-PA had been administered within the three-hour window, but he was unable to quantify the amount of improvement. However, he also testified that plaintiff was relatively young, was not diabetic, and had a normal CT scan, and so "more likely than not . . . he would have had some response to TPA" and there was a "30 to 50 percent chance greater than had he not been given TPA, of him being cured, and it might be better than that." So, according to Dr. Levine's testimony, if t-PA had been timely administered, plaintiff would have had a relatively good chance of obtaining an improvement in his condition up to and including a possible thirty to fifty percent chance of a complete cure.

Moreover, the trial court was tasked with evaluating the evidence in a light most favorable to the nonmoving party. *Quinto, supra* at 362. Dr. Levine testified that there was a better than fifty percent chance of "some improvement" in plaintiff's condition. Thus, a jury could, at the very least, conclude that plaintiff was entitled to damages for the loss of an opportunity to achieve "some improvement." Although somewhat imprecise, *Purcell, supra,* the jury could award at least a modest amount of damages for this loss, even if it determined that plaintiffs' proofs were insufficient to justify damages for loss of an opportunity to achieve an even better result, such as a cure. Therefore, while the amount of improvement plaintiff might have gained from t-PA was not precisely estimated, Dr. Levine's testimony was sufficient to permit a reasonable juror to arrive at a determination of damages. We conclude that the trial court erred by granting summary disposition on this issue because plaintiff presented sufficient evidence to establish a jury-submissible issue regarding damages.

### IV. COMPLIANCE WITH MCL 600.2912A(2)

Although we have concluded that the trial court committed error requiring reversal when it granted summary disposition to defendants on the basis that plaintiffs' damage claim was too speculative, we conclude that the trial court erred in concluding that plaintiffs sufficiently demonstrated that it was more probable than not that the failure to administer t-PA caused plaintiff the loss of a greater than fifty percent opportunity to achieve a better result. MCL 600.2912a(2). We therefore affirm the trial court's grant of summary disposition on this alternative basis. *Boardman v Dep't of State Police,* 243 Mich App 351, 358; 622 NW2d 97 (2000). However, because our conclusion is

based on the application of our previous decision in *Fulton, supra,* a decision with which we disagree, we have determined that we must affirm the trial court only because we are compelled to do so by *Fulton.* MCR 7.215(J)(2).

### a. STANDARD OF REVIEW AND THE STATUTE UNDER REVIEW

This issue involves statutory construction, a question of law that we review de novo. *Yaldo v North Pointe Ins Co,* 457 Mich 341, 344; 578 NW2d 274 (1998). Our Supreme Court summarized in *Yaldo, supra* at 346:

> The primary goal of judicial interpretation of statutes is to give effect to the intent of the Legislature. *Farrington v Total Petroleum, Inc,* 442 Mich 201, 212; 501 NW2d 76 (1993). In determining legislative intent, we look first at the words of the statute. If the language is clear and unambiguous, judicial construction is not normally permitted. If reasonable minds can differ regarding its meaning, then judicial construction is appropriate. *Indenbaum v Michigan Bd of Medicine (After Remand),* 213 Mich App 263; 539 NW2d 574 (1995). The Legislature is presumed to have intended the meaning it plainly expressed. *Id.*

MCL 600.2912a(2) provides:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. *In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.* [Emphasis supplied.]

### b. THE *FULTON* DECISION

In *Fulton, supra* at 77-78, this Court considered an issue related to the one raised in this appeal: "whether

the second sentence of the statute requires a plaintiff in order to recover for loss of an opportunity to survive to show only that the initial opportunity to survive before the alleged malpractice was greater than fifty percent . . . or, instead, that the opportunity to survive was reduced by greater than fifty percent because of the alleged malpractice . . . ." This Court considered the language of MCL 600.2912a(2) and both the majority and the dissent concluded that the second sentence of the statute was ambiguous. *Fulton, supra* at 79-80, 86. The *Fulton* majority reasoned, *id.* at 79-80:

> In examining the second sentence of MCL 600.2912a(2), it is not clear to what the Legislature was referring when it stated that "the opportunity" must be greater than fifty percent. "[T]he opportunity" could either refer to the plaintiff's initial opportunity to survive or achieve a better result before the alleged malpractice or could refer to the plaintiff's loss of opportunity to survive or achieve a better result. In order for the language of MCL 600.2912a(2) to plainly indicate that the former interpretation of the statute was intended, the word "initial" must be inferred to modify "opportunity" where the statute refers to the plaintiff's burden of showing that "the opportunity was greater than 50%." However, for the language of the statute to plainly indicate that the latter interpretation of the statute was intended, the words "loss of" must be inferred to modify "opportunity." Because the statute does not contain either of these modifiers or any other words explaining to which "the opportunity" refers, we believe that reasonable minds can differ regarding the meaning of the statute. Because the second sentence of the statute is ambiguous, judicial construction is appropriate. *Adrian School Dist [v Michigan Pub School Employees' Retirement Sys,* 458 Mich 326, 332; 582 NW2d 767 (1998)].

This Court recognized that the statute was adopted in reaction to our Supreme Court's decision in *Falcon v Mem Hosp,* 436 Mich 443; 462 NW2d 44 (1990), where the Supreme Court "held that the decedent's loss of [a]

37.5 percent opportunity [to survive] was actionable because it constituted a loss of a substantial opportunity of avoiding harm." *Fulton, supra* at 81.[8] The Legislature " 'immediately rejected *Falcon*' by enacting MCL 600.2912a(2)." *Id.*, quoting *Weymers v Khera*, 454 Mich 639, 649; 563 NW2d 647 (1997).[9] This Court

---

[8] This Court noted that in *Falcon* the decedent's lost opportunity to survive and initial opportunity to survive were the same—37.5%— "because in that case the result of the defendants' negligence was certain death." *Fulton, supra* at 82. This Court then contrasted the plaintiff's situation: "Fulton's initial opportunity to survive, eighty-five percent, is not the opportunity that she lost. Plaintiff's expert opined that defendants' alleged negligence caused her to have a sixty to sixty-five percent chance of survival. She suffered a loss of twenty to twenty-five percent chance of survival." *Id.*

[9] We recognize that in *Weymers v Khera*, 454 Mich 639, 649; 563 NW2d 647 (1997), our Supreme Court made the seemingly categorical statement: "we hold that no cause of action exists for the loss of an opportunity to avoid physical harm less than death." We are convinced, however, that this holding is not controlling on our decision in this case. The *Weymers* decision addressed the issue whether the Court's prior holding in *Falcon* should be extended. The Court noted that the Legislature had reacted to the *Falcon* decision by enacting MCL 600.2912a(2), but, although the Court set forth the statute in a footnote (*Weymers, supra* at 649 n 14), the Court did not base its holding in *Weymers* on a reading or analysis of the statute. The *Fulton* panel so noted when it observed that the cause of action in *Weymers* arose after the *Falcon* decision, but before October 1, 1993, the effective date of MCL 600.2912a(2), and that "the Court did not analyze the statute." By enacting MCL 600.2912a(2), the Legislature recognized causes of action for both "loss of an opportunity to survive" and for "loss of . . . an opportunity to achieve a better result"; the latter, in our opinion, applies to physical harm less than death. Thus, of necessity, the Supreme Court in *Weymers* could not have meant its decision to control causes of action other than those that arose post-*Falcon* and pre-MCL 600.2912a (2)—as did the cause of action in *Weymers*. Therefore, in our opinion, when viewed in context, the holding in *Weymers* that "no cause of action exists for the loss of an opportunity to avoid physical harm less then death" could not apply to a cause of action—such as the one presented in this case—that arose *after* the effective date of MCL 600.2912a(2). We conclude that the broad holding of *Weymers* is simply inapplicable to this case for the reasons stated, and therefore, while acknowledging our duty

reasoned in *Fulton* that the focus of the Supreme Court's decision in *Falcon* was on the loss of *an* opportunity, not the loss of an *initial* opportunity. *Fulton, supra* at 82. This Court therefore held that "MCL 600.2912a(2) requires a plaintiff to show that the loss of the opportunity to survive or achieve a better result exceeds fifty percent." *Id.* at 83.

Applying this formulation to the facts of the case, the trial court in *Fulton* subtracted the plaintiff's opportunity to survive after the defendant's alleged malpractice from the initial opportunity to survive without the malpractice.[10] This Court stated:

> In this case, plaintiff's expert stated that Fulton's initial opportunity to survive was eighty-five percent and that her opportunity to survive after the alleged malpractice was

to follow controlling decisions of the Supreme Court, we do not view *Weymers* as controlling on this issue. Further, in *Weymers*, the Supreme Court described the "lost chance" doctrine or the "lost opportunity" doctrine as one that permits recovery on the basis of the mere *possibility* that the tortfeasor's negligence was a cause of the ultimate harm. *Weymers, supra* at 653, citing *Jones v Owings*, 318 SC 72; 456 SE2d 371 (1995). The *Weymers* Court explained that the doctrine permits a plaintiff to maintain an action for malpractice when the malpractice denied the plaintiff an opportunity to avoid the injury, even where the opportunity was fifty percent or less. *Id.* at 648 n 13. We think it clear that the *Weymers* Court was focused on the problem of a plaintiff recovering for a loss of opportunity under circumstances where the initial opportunity was fifty percent or less, so that it could not be said that the harm was caused by the doctor's malpractice, rather than the patient's poor initial prognosis. In our opinion, the amended statute applies to a different set of facts: situations in which the initial opportunity to survive or to achieve a better result was more than fifty percent.

[10] This Court applied the *Fulton* formulation in *Potter v Ingham Regional Medical Ctr,* unpublished memorandum opinion of the Court of Appeals, issued February 18, 2003 (Docket No. 237450). In *Potter* the opportunity for a complete recovery without malpractice was seventy-five percent and the malpractice allegedly reduced the opportunity to fifty percent. Therefore, the lost opportunity was only twenty-five percent and this Court held that this did not satisfy MCL 600.2912a(2).

sixty to sixty-five percent. Therefore, because her loss of opportunity due to defendants' alleged malpractice was not greater than fifty percent, we hold that the trial court erred in denying defendants' motion for summary disposition. [*Fulton, supra* at 84.]

Dissenting, Judge SMOLENSKI concluded "that MCL 600.2912a(2) only requires a plaintiff to show that the decedent's initial opportunity to survive was greater than fifty percent and that the alleged malpractice more probably than not reduced that opportunity to survive." *Id.* at 85. Judge SMOLENSKI was persuaded by this Court's analysis in *Wickens v Oakwood Healthcare Sys,* 242 Mich App 385; 619 NW2d 7 (2000), rev'd in part and vacated in part 465 Mich 53; 631 NW2d 686 (2001). This Court considered the same issue in *Wickens* that we consider in this appeal and concluded that medical malpractice plaintiffs had "to show that, had the defendant not been negligent, there was a greater than fifty percent chance of survival or a better result." *Wickens, supra,* 242 Mich App 392. Our Supreme Court's subsequent reversal of our *Wickens* decision was based on its determination that a living plaintiff could not sue for a loss of an opportunity to survive. *Wickens, supra,* 465 Mich 54. The Supreme Court therefore found that it was unnecessary for this Court to have "addressed whether plaintiff had a cause of action solely on the basis of the reduction in her ten-year survival rate" and it vacated that portion of this Court's decision. *Id.* at 62.

### c. *FULTON* AND THE TESTIMONY IN THIS CASE

The decisions in *Falcon* and *Fulton* concerned a plaintiff's lost opportunity to survive. This appeal concerns plaintiff's lost opportunity to achieve a better result. Pursuant to *Fulton,* plaintiff was required to prove that he lost an opportunity to achieve a better

result that exceeded fifty percent. Plaintiff's expert witness testified that, without administration of t-PA, twenty percent of stroke victims would achieve a full cure. According to the expert, administration of t-PA would increase the "full cure" recovery rate to the range of thirty or thirty-one to fifty percent. Thus, under the *Fulton* majority's approach, the actual lost opportunity to achieve a full cure is obtained by subtracting plaintiff's likelihood of a cure *without* t-PA (twenty percent) from the likelihood of a cure *with* t-PA (thirty to fifty percent); this would result in an eleven to thirty percent better opportunity of a full cure with t-PA. Plaintiff was therefore unable to show a lost opportunity to achieve a full cure that was greater than fifty percent.

However, the statute does not require a full cure; it only requires a lost opportunity to achieve a "better result." A "better result" includes a continuum from slight improvement up to, and including, a full cure. We note that plaintiff's expert witness, Dr. Levine, also testified that if t-PA had been administered, plaintiff would have had more than a fifty percent probability of "some improvement," but he could not estimate what that improvement would be other than that plaintiff "would have likely had some benefit." The witness testified that

> [i]t appears that at least 50 percent, if not more, of patients in the trial had some improvement with TPA, whether it's a mild improvement or moderate or severe—not severe, but great improvement, so anywhere from some improvement to a little . . . .

This answer was followed-up with this colloquy:

> *Q.* So based on that study—I want to make sure I understand you correctly—you're saying that at least 50 percent of the people who had TPA who are appropriate candidates for TPA had some type of improvement?

*A.* Right, or it could be just a little bit.

*Q.* It wasn't broken down as to what kind of improvement or to what extent?

*A.* The only kind we quantify, the only amount we quantify is getting back to a zero or one or a near cure at three months.

This testimony suggests that there was at least a fifty percent chance for a stroke victim receiving t-PA to obtain *some better result.* Dr. Levine further testified:

I think that all things considered in terms of [plaintiff's] age, the lack of diabetes, the normal CT scan, I think it is, in my opinion, *more likely than not that he would have had some response to TPA.*

I'm not saying he would have been more likely than not cured, *but I'm saying more likely than not, he'd have some response.*

I think there's a chance, *there's a 30 to 50 percent chance greater than had he not been given TPA, of him being cured and it might be better than that* given that he had a normal CT and that he was younger and younger people tend to do better anyway.

Those kinds of things; he wasn't diabetic, so they tend to do better. [Emphasis supplied.]

In response to clarifying questioning by defendants' attorney, Dr. Levine further testified:

*Q.* In terms of rendering testimony opinion in terms of trial, if I understand you correctly, if I can break this down, *you are saying he had a more likely than not probability or chance of some improvement; in other words, more than a 50 percent chance of probability of some improvement?*

*A.* *Right.*

*Q.* But what improvement that is, you're not in a position to say?

*A.* I don't know anybody who can truly do that. [Emphasis supplied.]

d. THE PROBLEM WITH THE EXPERT'S TESTIMONY

It is necessary to point out that reaching a decision in this case based on Dr. Levine's assertions is unnecessarily difficult because of an unresolved problem with his testimony. The problem is that Dr. Levine compared rates of improvement, but did not consistently state the terms of the comparison and the attorneys' questioning did not resolve this confusion. In *Fulton,* the comparison was clear: eighty-five percent survival without the negligence and sixty to sixty-five percent survival with the negligence. The lost opportunity was twenty to twenty-five percent. In this case, the comparisons are not as clear.

Dr. Levine explained that the "cure rate" of thirty to fifty percent was a range that was derived from the overall data; that is, of all patients in the study who were given t-PA sometime during the three-hour window at least thirty (or thirty-one) percent, and at most fifty percent, were "cured."[11] Dr. Levine testified that the cure rate decreased as the time between the onset of the stroke and the "closing" of the three-hour window increased. In other words, if t-PA was administered within one hour of the stroke, the likelihood of a cure was about four times what it would be if the subject did not receive t-PA. [12] Subsequently, Dr. Levine stated:

[11] Dr. Levine defined a "cure" as the absence, three months after the stroke, of any evidence that the stroke had occurred.

[12] In this regard, it is important to note that, according to plaintiffs' time sequence, the earliest t-PA could reasonably have been administered was between 1-1/2 and 2 hours after the stroke occurred (t-PA could not have been administered until the doctor determined if plaintiff's stroke was ischemic or hemorrhagic; the CT head scan that showed the stroke was due to a blood clot was completed at 12:07 P.M.; it would have taken at least a few minutes to analyze the CT scan and order the appropriate quantity of t-PA; therefore, it is likely the administration of t-PA would not have occurred substantially before 12:30 P.M.—two hours after the

I think it's going to be at least 50 percent of those patients will have some benefit. The question is how much benefit. I can't give you that or tell you 100 percent, so if we say just ballpark, rough, half of 69 is 34, so you add the 34 plus the 31 that are cured, so you get, you know, over half the patients will probably have some benefit from TPA.

Dr. Levine did not explain why, given his repeated statement that thirty to fifty percent of the stroke victims who were given t-PA were "cured," he would also testify several times that a fixed percentage of thirty-one percent of stroke victims were cured. This discrepancy—if in fact it is a discrepancy—is significant. If only thirty-one out of every one hundred patients were cured, then there was no "range" of cures; rather, the cure rate would have been a flat thirty-one percent. Dr. Levine used the thirty-one figure when he performed the calculation in the preceding quotation. He testified that if thirty-one out of every one hundred were cured, that would leave sixty-nine victims who were not cured. But, according to Dr. Levine, at least half of those stroke victims would exhibit some degree of improvement. Therefore, he calculated that a total of thirty-one plus one-half of sixty-nine (thirty-four—actually 34.5) of those who were administered t-PA would obtain either a cure or some degree of improvement over those who were not given t-PA. It is not clear, however, just how this sixty-five percent "complete cure and some improvement" figure squares with the claimed thirty to fifty percent range of *cures* that would be expected from the administration of t-PA.

stroke). Following Dr. Levine's testimony, this would have been past the absolute optimal time for administering t-PA—within the first hour—but still within the three-hour window in which it could be expected that some degree of improvement would occur. Dr. Levine did not correlate the likelihood of "some improvement" occurring if t-PA was administered two hours after the stroke. His projections were based on the results of the entire study group where t-PA was administered sometime within the three-hour window.

We further note that, in comparing "cure rates," Dr. Levine acknowledged that twenty percent would be cured *without* t-PA while the cure rate increased to at least thirty-one percent (and perhaps as high as fifty percent) with t-PA. However, when testifying about the "some benefit" rate with t-PA, Dr. Levine estimated it would be roughly sixty-five percent, that is, thirty-one percent cured and another thirty-four percent who received some degree of benefit. But Dr. Levine was not asked how many stroke victims would improve to "some degree" if they were *not* administered t-PA. In other words, we assume that, just as with the contrast between those "cured" with t-PA and without t-PA, presumably there was some percentage of stroke victims who showed "some" improvement short of a full cure *without* t-PA. Therefore, to make the sixty-five percent figure used by Dr. Levine meaningful, it would be necessary to know the number who received "some benefit without t-PA" so that percentage could be subtracted from the "some benefit with t-PA" percentage pursuant to *Fulton*. But this information was not related by Dr. Levine.

### E. THE *FULTON* RESOLUTION: THE DISSENT AND THE MAJORITY

Nevertheless, we find the *Fulton* dissent's interpretation of the plain language of § 2912a(2) to be a more accurate rendition of the legislative intent. The statute demands that a medical malpractice plaintiff demonstrate that his opportunity to survive or achieve a better result was greater than fifty percent. MCL 600.2912a(2). When a plaintiff sues for malpractice, the suit is premised on the loss—because of the alleged malpractice—of *an* opportunity to survive or achieve a better result. It appears to us, as it did to the *Fulton* dissent, that the statute only demands that—

particularly at the summary disposition stage—the plaintiff establish that he had a better than fifty percent chance to survive or achieve a better result; if the initial opportunity was estimated to be, at best, below fifty percent, the Legislature has made a determination that such claims are simply too speculative and do not merit relief.[13] Dr. Levine's testimony, interpreted most favorably to the nonmoving party, *Quinto, supra* at 362, indicated that if plaintiff were given t-PA within the three-hour window, plaintiff's opportunity to achieve a better result would have been greater than fifty per-

---

[13] Application of the *Fulton* majority's, rather than the dissent's, interpretation leads to anomalous results. For example, if a plaintiff had an initial opportunity to survive or to achieve a better result of eighty-four percent, but because of the defendant's alleged malpractice, the chance was reduced to only thirty-five percent, the lost opportunity to survive or achieve a better result would be less than fifty percent (forty-nine percent) and the plaintiff would not be able to bring suit. It does not strike us as reasonable that the Legislature meant to deny plaintiffs in such circumstances the right to bring a lawsuit for recovery of so significant a lost opportunity to survive or achieve a better result. We would suggest that it is more reasonable to conclude that the Legislature intended to use the fifty percent threshold as a test to separate and prohibit lawsuits in which, even before the alleged malpractice, the opportunity to survive or achieve a better result is too speculative. Thus, if the initial opportunity to survive or achieve a better result was below fifty percent, the Legislature has made a determination that the plaintiff should be precluded from suing because any opportunity was already too speculative.

We realize this holding would permit a lawsuit in a situation where the initial opportunity to survive or achieve a better result was fifty-one percent, but after the alleged malpractice was reduced to forty-nine percent. We believe a judge or jury would be fully capable of taking into account the de minimis harm in such a situation when computing damages.

We also recognize that a reduction from fifty-one to forty-nine percent would not be "substantial," a concern expressed by the *Fulton* majority. 253 Mich App 83-84. However, MCL 600. 2912a(2) does not contain the word "substantial" and we are charged with interpreting the plain language of the statute. *Yaldo v North Pointe Ins Co,* 457 Mich 341, 346; 578 NW2d 274 (1998).

cent. Therefore, the failure to give t-PA to plaintiff resulted in the loss of an opportunity to achieve a better result. In our view, that testimony was sufficient to satisfy the legislative requirement and to survive summary disposition.

However, we are bound by our previous decision in *Fulton*. Applying the *Fulton* majority's analysis, Dr. Levine's testimony does not clearly establish that plaintiff lost an opportunity to achieve a better result greater than fifty percent. If plaintiff had a twenty percent chance of complete recovery without t-PA, under the *Fulton* majority's interpretation, that "without negligence" percentage should be subtracted from the anticipated improvement with t-PA because that would be the opportunity to achieve a better result that was lost. Dr. Levine estimated that totaling the cure rate with the additional anticipated fifty percent of the remainder "some improvement" percentage would give a total of sixty-five percent that could have obtained "some degree of improvement up to a full cure." However, per *Fulton,* subtracting the twenty percent cure rate without t-PA (and not even accounting for the "some improvement without t-PA rate") would give a lost opportunity to achieve a better result of forty-five percent. Because that is less than fifty percent, pursuant to the *Fulton* majority's interpretation of MCL 600.2912a(2), the trial court should have granted summary disposition to defendants for failure to satisfy § 2912a(2).

We therefore affirm the trial court's decision to grant summary disposition to defendants on the alternative ground that plaintiffs failed to establish that defendants' alleged malpractice deprived plaintiff of an opportunity to achieve a better result greater than fifty percent. *Boardman, supra* at 358.

V. GRANTING SUMMARY DISPOSITION BEFORE
DISCOVERY WAS COMPLETED

Plaintiffs finally claim that the trial court erred by granting summary disposition because discovery was not complete. This claim was raised in plaintiffs' motion for reconsideration. This Court reviews a trial court's decision regarding denial of a motion for rehearing or reconsideration for an abuse of discretion. *Herald Co, Inc v Tax Tribunal,* 258 Mich App 78, 82; 669 NW2d 862 (2003). "The movant must show that the trial court made a palpable error and that a different disposition would result from correction of the error." *Id.*; see also MCR 2.119(F)(3).

We acknowledge that "a motion under MCR 2.116(C)(10) is generally premature if discovery has not closed, unless there is no fair likelihood that further discovery would yield support from the nonmoving party's position." *Townsend v Chase Manhattan Mortgage Corp,* 254 Mich App 133, 140; 657 NW2d 741 (2002), citing *American Community Mut Ins Co v Comm'r of Ins,* 195 Mich App 351, 363; 491 NW2d 597 (1992).

Plaintiffs suggest on appeal that their expert was prepared to analyze the data more thoroughly and that this analysis could have established a more definite estimate of plaintiff's likelihood of improvement had he received t-PA. However, the already extended discovery period was scheduled to terminate less than thirty days after plaintiffs filed their motion for reconsideration in the trial court. Moreover, plaintiffs offered nothing other than the speculation that Dr. Levine *might* be able to offer additional pertinent information after completing his reexamination of the data. Plaintiffs offered no set time frame within which the reexamination would be completed. To date, plaintiffs have failed to present any evidence that Dr. Levine has completed

the analysis or that the result of further analysis was favorable to plaintiffs. In other words, plaintiffs request this Court to find that the trial court abused its discretion because the court did not indulge their speculation.

We conclude that plaintiffs have failed to show that the trial court abused its discretion by denying reconsideration where plaintiffs were unable to demonstrate that additional discovery would have produced admissible evidence favorable to plaintiffs.

Affirmed.