*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEARSON CONSTRUCTION COMPANY, INC.,

Plaintiff/Counterdefendant-Appellant,

v

THE DAILEY COMPANY,

Defendant-Appellee,

and

HIGH TOP BUDS, LLC,

Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
April 17, 2026
12:13 PM

No. 369918
Oakland Circuit Court
LC No. 2022-194484-CB

Before: GADOLA, C.J., and MURRAY and M.J. KELLY, JJ.

PER CURIAM.

In this action for breach of a construction contract, plaintiff/counterdefendant Pearson Construction Company, Inc. appeals as of right from the trial court's judgment in favor of defendant/counterplaintiff High Top Buds, LLC, entered following a jury trial. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

HTB contracted with general contractor The Dailey Company[1] for the construction of a commercial cannabis grow facility. In turn, Dailey and Pearson entered into a subcontract for Pearson to do carpentry work on the project. The subcontract included the installation of fiberglass reinforced plastic (FRP) walls.

After completing its work on the project, Pearson filed this action against Dailey for breach of contract and against HTB for unjust enrichment, alleging that it informed Dailey of humidity

---

[1] Dailey is not a party to this appeal.

issues affecting installation of the FRP, but Dailey directed Pearson to continue the work, and Pearson completed its portion of the project, but HTB refused to pay Dailey for Pearson's work.

HTB subsequently filed a countercomplaint against Pearson for breach of duty, both under the common law and as a third-party beneficiary to the subcontract, alleging that "Pearson breached its duty to HTB by abiding by Dailey's instruction to install the FRP paneling despite unacceptably high humidity levels and against Pearson's own recommendation that the installation work not proceed," resulting in bubbling of the panels. Pearson then moved for summary disposition of HTB's breach of duty claim under MCR 2.116(C)(8) and (C)(10), arguing in part that HTB was barred from bringing a claim as a third-party beneficiary to the subcontract because the subcontract did not include any express promises or direct benefits to HTB. In its brief in opposition to Pearson's motion, HTB argued the court should deny the motion, and instead grant HTB summary disposition under MCR 2.116(I)(2), because HTB is a third-party beneficiary of the contract pursuant to MCL 600.1405, and Pearson had a common law duty to HTB to exercise reasonable care. The court ultimately denied Pearson summary disposition and instead granted HTB partial summary disposition under MCR 2.116(I)(2), finding HTB to be a third-party beneficiary of the subcontract between Pearson and Dailey as a matter of law under MCL 600.1405.

Following that ruling, HTB moved for partial summary disposition of Pearson's claims against it under MCR 2.116(C)(10), asserting that Pearson breached the subcontract by failing to install perimeter walls, as required by the subcontract. The trial court agreed, finding the subcontract language to be clear and unambiguous, and granted the motion.

Ultimately, a jury trial was held, and the jury found Pearson liable in the amount of $250,000 for its failure to construct the perimeter walls, and in the amount of $751,958.25 for breach of contract as to the interior walls. This appeal followed.

II. SUMMARY DISPOSITION

A. THIRD-PARTY BENEFICIARY

Pearson first argues that the trial court erred in granting HTB partial summary disposition pursuant to MCR 2.116(I)(2) and holding that HTB is a third-party beneficiary to the subcontract between Pearson and Dailey.

We review de novo a trial court's decision on a motion for summary disposition. *Yopek v Brighton Airport Ass'n, Inc*, 343 Mich App 415, 422; 997 NW2d 481 (2022). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019).

> When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id*. (quotation marks and citations omitted).]

"On the other hand, summary disposition is proper under MCR 2.116(I)(2) if the court determines that the opposing party, rather than the moving party, is entitled to judgment as a matter of law." *Rataj v Romulus*, 306 Mich App 735, 747; 858 NW2d 116 (2014) (quotation marks and citation omitted). "We also review de novo the existence and interpretation of a contract as a question of law." *Bailey v Schaaf*, 293 Mich App 611, 623; 810 NW2d 641 (2011).

Pearson argues, as it did below, that it was entitled to summary disposition because HTB was barred from bringing a counterclaim against it for breach of duty as a third-party beneficiary to the subcontract. Under MCL 600.1405:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

With use of the modifier "directly," the Legislature

> "intended 'to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract.' " *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003), quoting *Koenig v South Haven*, 460 Mich 667, 677; 597 NW2d 99 (1999). When determining whether MCL 600.1405 applies to a purported third-party beneficiary, "a court should look no further than the form and meaning of the contract itself" and should view the contract objectively. *Schmalfeldt*, 469 Mich at 428 (quotation marks omitted). [*Boylan v Fifty Eight LLC*, 289 Mich App 709, 728-729; 808 NW2d 277 (2010).]

"Only intended, rather than incidental, third-party beneficiaries may sue when a contractual promise in their favor has been breached." *Kisiel v Holz*, 272 Mich App 168, 170; 725 NW2d 67 (2006). In other words:

> A third person cannot maintain an action on a simple contract merely because he or she would receive a benefit from its performance or would be injured by its breach. Third-party beneficiary status requires an express promise to act to the benefit of the third party; where no such promise exists, that third party cannot maintain an action for breach of the contract. Further, a determination that a contract establishes an intended third-party beneficiary through a direct promise to the third party must be based on an objective review of the form and meaning of the contract itself. [*Id*. at 170-171 (quotation marks and citations omitted).]

Generally, although work performed by a subcontractor ultimately benefits the property owner, the property owner is not an intended third-party beneficiary of the contract between the subcontractor and contractor. *Id*. at 171. "Absent clear contractual language to the contrary, a property owner does not attain intended third-party-beneficiary status merely because the parties

to the subcontract knew, or even intended, that the construction would ultimately benefit the property owner." *Id*.

Here, as the trial court concluded, although HTB is not a party to the subcontract, Pearson made direct promises to HTB as "owner" of the property through clear contractual language. First, the subcontract named the project "High Top Buds – Labar Dr." See *Vanerian v Charles L. Pugh Co, Inc*, 279 Mich App 431, 436; 761 NW2d 108 (2008) ("Any argument that [the] defendant was not clearly aware that the scope of its contractual undertakings encompassed [the] plaintiff is absurd, given the nature of the contract; it was the 'Marie Vanerian Residence' job."). And in several different provisions, Pearson, as the "subcontractor" adopts duties owed directly to the project's "owner," listed as HTB. Section 3.5 states, in part, that the "Subcontractor shall indemnify and hold Owner and Contractor harmless from and against any and all claims for nonpayment by sub- subcontractors, suppliers, materialmen, or laborers arising in connection with the Subcontract Work . . . ." In § 4.2, Pearson agreed to cooperate with the "owner" to participate in the preparation of coordinated drawings and work schedules. In § 12.1, Pearson agreed to indemnify the contractor and "owner" from all liability and damages from injury or death sustained by any person, including the subcontractor's employees. And, most significantly, § 17.1 states, "Subcontractor warrants to Contractor and Owner that all material and equipment furnished shall be new unless otherwise specified, and that all of the Subcontract Work shall be of good quality, free from faults and defects and in conformance with the Contract Documents," while § 17.2 states, in part: "Subcontractor agrees to promptly make good, without cost to Contractor or Owner, any and all defects in the Subcontract Work due to faulty workmanship and/or materials which may appear within the guarantee or warranty period established in the Contract Documents . . . ."

Pearson asserts that the introductory clause to Section 12, which states that the "Subcontractor specifically obligates itself to the Contractor in the following respects," makes clear that HTB is simply an incidental beneficiary of Pearson's obligations in that section. But even so, that fact would not negate the several other direct promises Pearson makes to HTB throughout the subcontract.

Finally, Pearson argued in its briefing below that the primary contract for the project between Dailey and HTB provides that the contract document shall not be construed to create a contractual relationship between HTB and any subcontractor, and asserts in its reply brief on appeal that the subcontract expressly incorporates the primary contract. Thus, Pearson contends, the subcontract is at the very least ambiguous. Indeed, the subcontract states:

> The Contract Documents consist of this Subcontract, Drawings per **EXHIBIT "D"**, Specifications, all Addenda issued prior to the execution of this Subcontract, the prime contract between Owner and Contractor, the Project Schedule as may be amended from time to time, any subsequent modifications or revisions to any of the foregoing, and any other documents listed in or referred to by the Prime Contract.

> All of the other Contract Documents described above are made a part of this Subcontract and are fully incorporated herein. Subcontractor acknowledges that it has carefully examined the Contract Documents and understands them completely.

And the primary contract between Dailey and HTB, in turn, states, "The Contract Documents shall not be construed to create a contractual relationship of any kind . . . between the Owner and a Subcontractor or a Sub-subcontractor."

"A contract is ambiguous when its provisions irreconcilably conflict. A court may not ignore provisions of a contract in order to avoid finding an ambiguity." *In re Estate of Koch*, 322 Mich App 383, 398; 912 NW2d 205 (2017) (citations omitted). In general, when a contract is ambiguous, the meaning of the contract is a question of fact for the jury. *Id*.

As Pearson argues, the primary contract containing the above language appears to conflict with the subcontract provisions wherein Pearson makes direct promises to HTB, as the owner of the project. However, even assuming that to be true, Pearson ignores the provision in the subcontract right below those incorporating the primary contract and other documents, which states: "Subcontractor is bound to Contractor by the Contract Documents and hereby assumes toward Contractor, with respect to Subcontractor's performance, the obligations and responsibilities, rights and remedies that Contractor assumes toward Owner under the Contract Documents. *In case of conflicts, the Subcontract shall control*." Accordingly, Pearson's argument fails, and we hold that the trial court did not err when it granted summary disposition to HTB on the basis that HTB is a third-party beneficiary to the subcontract.

## B. LIABILITY FOR PERIMETER PARTITION WALLS

Pearson also argues that the trial court erred when it granted partial summary disposition to HTB, holding Pearson liable for its failure to construct perimeter partition walls as required by the subcontract.

As a third-party beneficiary to the subcontract, HTB has the same right to enforce the subcontract as the parties to the contract. *Shay v Aldrich*, 487 Mich 648, 665-666; 790 NW2d 629 (2010). When interpreting a contract:

> "[I]t is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning." *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). Contracts must be read as a whole, and words must be considered in context. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 356; 596 NW2d 190 (1999). Courts must "give effect to every word, clause, and phrase, and a construction should be avoided that would render any part of the contract surplusage or nugatory." *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 715; 706 NW2d 426 (2005). "Inartfully worded or clumsily arranged contract terms do not render a contract ambiguous if it fairly admits of one interpretation." *Village of Edmore v Crystal Automation Sys, Inc*, 322 Mich App 244, 262; 911 NW2d 241 (2017). Unambiguous contracts must be enforced as written. *In re Smith Trust*, 480 Mich at 24. [*Magley v M & W Inc*, 325 Mich App 307, 317-318; 926 NW2d 1 (2018).]

The terms of the subcontract, which includes the attached Pre-Award Scope Form, unambiguously required Pearson to construct perimeter partitions, in accordance with the trial court's ruling to that effect. The April 13, 2021 base bid of $694,000 for the project, which was

incorporated into the Subcontract Pre-Award Form, explicitly included construction of the perimeter partitions. As provided on that form under "SCOPE OF WORK," the carpentry work included installation of "Duramax PVC wall panels (Partition types 17, 18, 19)," and type 18G refers to the perimeter exterior walls.[2] The Pre-Award Form also lists several alternate options that could be selected to either add or remove work, with associated cost increases and decreases. "Alt 2[3]" would "DEDUCT Perimeter partitions" at a cost savings of $42,000, and was specifically "not accepted," while "Alt 5A," which would "ADD FRP on DensGlass ilo Duramax panels at interior partitions only" was accepted, with a corresponding cost increase of $52,000. This selection increased the total contract amount to $746,000 (the base bid of $694,000 plus Alt 5A at $52,000).

Pearson argues, as it did below, that by accepting Alternate 5A, Dailey knew that Alternate 2 was void, because the cost for Alternate 5A already included the savings from not constructing the exterior partition walls, and directs the court's attention to an April 30, 2021 updated bid. In that proposed bid, "ALT 5A" would "**ADD $52,000.00** FRP on DensGlass in lieu of base bid Truss Core Panels, deduct perimeter exterior wall at locations described in ALT 2." It further states, "(Please note (1) you can select either ALT 4 or ALT 5, but not both, (2) if you select ALT 4A or ALT 5A, ALT 2 is void)[.]" But the April 30 bid is not included as part of the subcontract. Rather, the Pre-Award Scope form expressly incorporated into the subcontract and detailed above was taken from "Bid Package 2 dated 1-11-21," with the "Base Bid (4-13-21 quote)."

Pearson asserts that the court should have read this language into the subcontract and denied HTB summary disposition. But " '[p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous,' " like the subcontract here. *Barclae v Zarb*, 300 Mich App 455, 480; 834 NW2d 100 (2013) (citations omitted). And "[w]e cannot read words into the plain language of a contract." *Northline Excavating, Inc v Livingston Co*, 302 Mich App 621, 628; 839 NW2d 693 (2013). Further, the subcontract contains a merger clause stating that the "requirements of [the] agreement and referenced specifications listed in this exhibit shall take precedence over all proposals submitted to date." If a contract "contains an integration clause, parol evidence is only admissible (1) to prove that the clause was fraudulent, (2) to invalidate the entire contract, or (3) if the contract is obviously incomplete on its face." *Zwiker v Lake Superior State Univ*, 340 Mich App 448, 476; 986 NW2d 427 (2022) (citations omitted). None of the exceptions are applicable here.

Pearson's argument that Dailey never intended Pearson to build the perimeter partitions also lacks merit. As provided above, evidence of the parties' intent beyond the terms of the

---

[2] Alternate 2, which will be discussed more fully below, provides the option to deduct from the scope of work the perimeter exterior walls, including type 18G, and Pearson states in its brief on appeal that "[t]he parties do not dispute that Partition Type 18 is the exterior perimeter partition walls in the grow rooms."

[3] The Alternates are also listed on Page 4, ¶ 12 of the Subcontract Pre-Award Form, with "ALT 2" described in more detail as the option to "DEDUCT walls at the perimeter exterior walls in these locations: (Type 2G – Room 107 & 117/Type 18G – Rooms 101 thru 106; 112 thru 116)."

unambiguous contract may not be applied to alter the terms of the contract. *Barclae*, 300 Mich App at 480. Finally, Pearson asserts, correctly, that HTB did not allege a breach of the subcontract for failure to install perimeter partitions in its countercomplaint, but fails to elaborate or specifically argue that the trial court erred in granting summary disposition on this basis. Accordingly, any argument to that effect is abandoned. See *Lashbrook v Grasak*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369669); slip op at 5.

## III. MANIFEST INJUSTICE

Pearson next argues that the trial court's decision to allow its erroneous summary disposition ruling holding Pearson liable for failure to install the perimeter walls to be presented to the jury amounted to manifest injustice.

In his opening statement and closing argument, HTB's counsel framed the issues as: (1) a determination of damages for Pearson's failure to install perimeter panels, for which the court already found Pearson liable, and (2) whether Pearson breached its guarantee of good workmanship on the interior FRP walls, and to what extent. The trial court instructed the jury to that effect, and the verdict form asked the jury to award damages for the perimeter walls without making its own finding of liability.

As HTB contends, Pearson's argument here appears to be just another way to challenge the trial court's ruling on HTB's partial motion for summary disposition that Pearson was liable under the subcontract for failure to install perimeter partitions. Pearson essentially argues that the trial court should not have instructed the jury, nor should the verdict form have included, that Pearson was liable to HTB under the subcontract for failure to install the perimeter partitions, because the trial court erred in granting summary disposition on that ground. However, as concluded above, the trial court did not err in granting summary disposition on that ground. Accordingly, HTB counsel's statements regarding the court's ruling as to Pearson's liability, the court's instructions to that effect, and the verdict form including that ruling did not amount to manifest injustice.

## IV. EXPERT QUALIFICATION

Pearson next argues that the trial court abused its discretion by qualifying HTB's liability expert, Terry Buschert, as an expert witness.

We review

> for an abuse of discretion a trial court's determination of the qualifications of a proposed expert witness. This Court likewise reviews for an abuse of discretion a trial court's decision whether to admit evidence, although admission of legally inadmissible evidence is necessarily an abuse of discretion. The interpretation of an evidentiary rule is reviewed de novo in the same manner as the examination of the meaning of a court rule or a statute. Rules of evidence are construed in the same way as statutes. [*Chapin v A&L Parts, Inc*, 274 Mich App 122, 126; 732 NW2d 578 (2007) (quotation marks and citations omitted).]

"An abuse of discretion occurs when a circuit court chooses a result that falls outside the range of reasonable and principled outcomes." *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013).

Under MRE 702:

> The admission of expert testimony requires that (1) the witness be an expert, (2) there are facts in evidence that require or are subject to examination and analysis by a competent expert, and (3) the knowledge is in a particular area that belongs more to an expert than to the common man. The party presenting the expert bears the burden of persuading the trial court that the expert has the necessary qualifications and specialized knowledge that will aid the fact-finder in understanding the evidence or determining a fact in issue. A witness may be qualified as an expert by knowledge, skill, experience, training, or education. [*Surman v Surman*, 277 Mich App 287, 308; 745 NW2d 802 (2007). (citations omitted).]

The trial court serves as the gatekeeper under MRE 702, requiring

> them "to review *all* expert opinion testimony" for admissibility under that rule. *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004). "This gatekeeper role applies to *all* stages of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). [*Platt Convenience, Inc v Ann Arbor*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 359013); slip op at 11.]

During direct examination, Buschert testified extensively regarding his qualifications, stating that he had worked for a company called Architectural Metals for 36 years, and had expertise in wall systems, roofs, and the full envelope system through running jobs and directing the service department which helped customers deal with problematic buildings. He also gained knowledge and skills regarding envelope systems through training with the National Center for Construction Education and Research, which led him to teaching. Further, Pearson's counsel conducted voir dire, and the court asked Buschert additional questions regarding his background and experience.

Pearson challenges Buschert's qualifications on the basis that he did not graduate from high school and is neither an architect nor engineer. While Buschert did testify that he is not an architect or engineer, there is no indication in the record that Buschert did not graduate from high school. And the test for qualifying a witness under MRE 702 is broad and not necessarily dependent on education alone. See *Mulholland v DEC Int'l Corp*, 432 Mich 395, 403-404; 443 NW2d 340 (1989). Indeed, an expert witness may be qualified based on practical experience in a specific field, see *id*. at 403-407, which Buschert undoubtedly had.

Pearson also asserts that Buschert lacked specific experience in the installation of FRP on DensGlass, making him unqualified to testify as HTB's expert on Pearson's work quality.

Buschert did acknowledge that he had never installed Crane Composites FRP panels on DensGlass, as Pearson contracted with Dailey to do on the project. "Where the subject of the proffered testimony is far beyond the scope of an individual's expertise—for example, where a party offers an expert in economics to testify about biochemistry—that testimony is *inadmissible* under MRE 702." *Gilbert*, 470 Mich at 789. But the record here demonstrates that Buschert's testimony was not beyond the scope of his expertise. Again, Buschert had extensive experience with wall and envelope systems, and he testified regarding his method of evaluating Pearson's work on the project, which included acquiring the architect's prints and spec book, studying the Crane Composites instruction manual, and examining the work on site. Moreover, the court did not qualify Buschert as an expert in the installation of FRP on DensGlass, but rather as an expert on envelope systems, thereby limiting his testimony on that basis. See *Mulholland*, 432 Mich at 406 ("We continue to believe that the only safe rule is to ascertain with some specificity the range of the witness' qualifications and to permit testimony within that range."). Finally, any gaps in an expert's knowledge affect the weight of his or her testimony rather than the admissibility. *Woodruff v USS Great Lakes Fleet, Inc*, 210 Mich App 255, 260; 533 NW2d 356 (1995). On the basis of the above, we hold that the trial court did not abuse its discretion when it qualified Buschert as HTB's expert on liability.

## V. DIRECTED VERDICT

Finally, Pearson argues that the trial court erred by denying its motion for directed verdict because HTB's damages expert, Lance Hazel, was not qualified as an expert witness and his damages calculations lacked foundation.

We review

> de novo a trial court's decision on a motion for directed verdict. A directed verdict is appropriate only when no factual question exists upon which reasonable minds could differ. In reviewing a directed verdict, we review all the evidence presented up to the time of the motion to determine whether a question of fact existed. In deciding whether a directed verdict is appropriate, the trial court must view the testimony and all legitimate inferences from the testimony in the light most favorable to the nonmoving party; we review the evidence in the same manner. The trial court may not substitute its judgment for that of the jury when the evidence could lead reasonable jurors to disagree. [*Anaya v Betten Chevrolet, Inc*, 330 Mich App 210, 215-216; 946 NW2d 560 (2019) (citations omitted).]

Indeed, "where reasonable minds could differ regarding the level of certainty to which damages have been proved, this Court is careful not to invade the fact finding of the jury and substitute its own judgment." *Severn v Sperry Corp*, 212 Mich App 406, 415-416; 538 NW2d 50 (1995).

"The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan v Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "In an action based on contract, the parties are entitled to the benefit of the bargain as set forth in the agreement." *Ferguson v Pioneer State Mut Ins Co*, 273 Mich App 47, 54; 731 NW2d 94 (2006). Accordingly, "[t]he proper measure of damages for a breach of contract

is the pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached." *Id*. (quotation marks and citation omitted).

On appeal, Pearson asserts that the trial court erred in denying its motion for directed verdict because Hazel was not qualified as an expert but does not appear to challenge Hazel's qualifications specifically or elaborate further. Regardless, Pearson waived this argument by failing to raise it below. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289-290; 14 NW3d 472 (2023).

Pearson further challenges HTB's assertion of damages on the basis that Hazel's damages calculations lacked any foundation.

> It is true that damages that are speculative or based on conjecture are not recoverable. *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518, 525; 687 NW2d 143 (2004). However, it is not necessary that damages be determined with mathematical certainty; rather, it is sufficient if a reasonable basis for computation exists. *Id*. [*Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 255; 792 NW2d 781 (2010).]

Consistent with Pearson's arguments, Hazel testified on cross-examination that he did not obtain subcontractor estimates for the heating, cooling, ventilating, plumbing, and electrical work that would be done ancillary to replacement of the FRP panels, and acknowledged he had no foundation or basis for some of these estimates. But he clarified on redirect that he and Buschert work as a team to create estimates, and that Buschert provides him with the estimated man hours needed on a project to assist in calculating the overall estimate. Indeed, in his testimony on direct examination, Hazel stated that Buschert conducted the inspection of the project and reported back on what would be needed to redo the work. He also asserted that the figures for the various trades work were formed using his years of experience developing these estimates. On this record, a reasonable basis for Hazel's computation of damages exists.

Moreover, the jury had the opportunity to weigh the evidence before it and returned a verdict with damages lower than those requested by HTB for replacement of the FRP panels. HTB's counsel asked the jury to award over $1 million for replacement of the interior FRP panels, but the jury ultimately awarded $751,958. Thus, we will not "invade the fact finding of the jury and substitute [our] own judgment." *Severn*, 212 Mich App at 415-416.

Affirmed.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Michael J. Kelly