*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NORMA DEMOTT, as Personal Representative of
the ESTATE OF KENNETH PIONK, III,

        Plaintiff-Appellee,

v

VHS HARPER-HUTZEL HOSPITAL, INC, doing
business as HARPER-HUTZEL HOSPITAL, doing
business as DMC HUTZEL WOMEN'S HOSPITAL,
VHS PHYSICIANS OF MICHIGAN,
UNIVERSITY PEDIATRICIANS, MAYURA
MADANI, M.D., PLLC, DONALD OKOYE,
MAYURA S. MADANI, MONIKA BAJAJ, JORGE
L. LUA, and GRACE LIN,

        Defendants-Appellants.

FOR PUBLICATION
July 17, 2025
11:42 AM

No. 369500
Wayne Circuit Court
LC No. 22-003156-NH

Before: K. F. KELLY, P.J., and O'BRIEN and ACKERMAN, JJ.

O'BRIEN, J.

Plaintiff, the personal representative of the Estate of Kenneth Pionk, III, brought this medical-malpractice action alleging that defendants' negligence caused Kenneth Pionk, III, to die a few days after he was born. Plaintiff claimed, in relevant part, that Pionk's death caused her to suffer lost-earning-capacity damages and loss-of-services damages. Defendants moved for partial summary disposition, asking the trial court to dismiss plaintiff's complaint to the extent that it requested these damages. The trial court denied defendants' motion, and this appeal followed.

The parties on appeal agree that lost-earning-capacity damages are no longer available under the wrongful death act (WDA), MCL 600.2922, following our Supreme Court's decision in *Daher v Prime Healthcare Servs-Garden City, LLC*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 165377). The trial court thus erred by refusing to dismiss plaintiff's complaint to the extent that it requested lost-earning-capacity damages. But *Daher* did not resolve whether loss-of-services damages remain available under the WDA, and we hold that such damages do indeed remain available under the act. Defendants contend that plaintiff's request for loss-of-services

-1-

damages in this case is too speculative to go to a jury because plaintiff only requested loss-of-services damages for the period after Pionk would have turned 18, and there are no facts from which such damages can be reasonably extrapolated given that Pionk was only a few days old when he passed away. We hold that, in cases like this one, plaintiff's claim for loss-of-services damages is not barred as a matter of law, and her request for such damages can proceed at this early stage in the litigation. The trial court's ruling denying defendants' motion for partial summary disposition is therefore affirmed in part and reversed in part.

## I. BACKGROUND

Because this appeal essentially presents questions of law, the underlying facts are only briefly summarized. This case arises out of the death of Pionk. Pionk's mother—the personal representative of his estate—presented to the hospital on March 15, 2017, with elevated blood-pressure readings when she was "at 35 weeks gestation." Pionk was born three days later, on March 18, 2017, and passed away due to neonatal sepsis shortly thereafter. In March 2022, plaintiff filed the complaint giving rise to this action in which she alleged that various defendants committed medical malpractice by failing to timely diagnose and treat Pionk's neonatal sepsis. Plaintiff's complaint requested damages for, among other things, lost future earnings and loss of household services.

On September 13, 2023, defendants moved for partial summary disposition, asking the trial court to dismiss plaintiff's complaint to the extent that it requested damages for loss of future earnings and loss of household services. The trial court denied defendants' motion in a form order without oral argument. Defendants filed an application for leave to appeal, which this Court granted.[1]

## II. STANDARD OF REVIEW

A trial court's ruling on a motion for summary disposition is reviewed de novo. *Neal v Wilkes*, 470 Mich 661, 664; 685 NW2d 648 (2004). Defendants moved for summary disposition under MCR 2.116(C)(8) and (10). A motion brought under MCR 2.116(C)(8) "tests the legal sufficiency" of a complaint. *Feyz v Mercy Mem Hosp*, 475 Mich 663, 672; 719 NW2d 1 (2006). A (C)(8) motion considers the pleadings alone, and when a court reviews such a motion, it must accept all well-pleaded allegations as true. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). A motion filed under MCR 2.116(C)(8) "should be granted if no factual development could possibly justify recovery." *Feyz*, 475 Mich at 672.

A motion filed under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, in the light most favorable to the party opposing the motion." *Id*. at 119-120. A motion for summary disposition under MCR 2.116(C)(10) is properly granted when a claim presents no genuine issue of material fact and the

---

[1] *Estate of Kenneth Pionk III v VHS Harper-Hutzel Hospital Inc*, unpublished order of the Court of Appeals (Docket No. 369500).

moving party is entitled to judgment as a matter of law. *El-Khalil*, 504 Mich at 160. A genuine issue of material fact exists when, after viewing the evidence in a light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

"Whether a particular kind of damages is recoverable for a given cause of action is a question of law," reviewed de novo. *Daher*, ___ Mich at ___; slip op at 4. The interpretation and application of statutes, rules, and legal doctrines are likewise questions of law reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

## III.  DAMAGES UNDER THE WDA

Defendants first argue that the trial court erred by denying their motion for partial summary disposition because neither lost-earning-capacity damages[2] nor loss-of-services damages are available under the WDA. Subsection (6) of the WDA specifies the types of damages that are permitted by the act, stating in relevant part:

> In every action under this section, the court or jury may award damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the pain and suffering, while conscious, undergone by the deceased during the period intervening between the time of the injury and death; and damages for the loss of financial support and the loss of the society and companionship of the deceased. [MCL 600.2922(6).]

In *Thorn v Mercy Mem Hosp Corp*, 281 Mich App 644, 658; 761 NW2d 414 (2008), overruled in part by *Daher*, ___ Mich ___, this Court held that the WDA's damages provision permitted recovery of damages for loss of services in part because MCL 600.2922(6)'s use of the word "including" suggested a legislative intent "to permit the award of any type of damages, economic and noneconomic, deemed justified by the facts of the particular case," *Thorn*, 281 Mich App at 651. In *Denney v Kent Co Rd Comm*, 317 Mich App 727, 731-732; 896 NW2d 808 (2016), overruled in part by *Daher*, ___ Mich ___, this Court extended this reasoning from *Thorn* to conclude that "damages for lost earnings are allowed under the wrongful-death statute." Then, last year in *Daher*, our Supreme Court ruled that *Denney* erred when it held that damages for lost future earnings were available under the WDA, and because *Denney* merely extended the reasoning from *Thorn*, *Daher* overruled *Thorn* to the extent that its reasoning conflicted with *Daher*. *Daher*, ___ Mich at ___; slip op at 26-27.

---

[2] Lost earning capacity refers to "wages a person 'could' have earned but for the accident," *Hannay v Dep't of Transp*, 497 Mich 45, 80; 860 NW2d 67 (2014), and is the same thing as "lost future earnings," *Daher*, ___ Mich at ___; slip op at 3.

There can be no serious dispute that *Daher* resolves this appeal with respect to plaintiff's request for lost-earning-capacity damages. The trial court therefore erred by refusing to dismiss plaintiff's claims to the extent that plaintiff is requesting lost-earning-capacity damages.

But whether *Daher*'s reasoning extends to loss-of-services damages is an open question.[3] To answer that question, we begin with a review of *Daher* and its reasons for concluding that lost-earning-capacity damages are unavailable under the WDA.

## A. *DAHER*

*Daher* is a statutory-interpretation case—*Daher* interpreted the WDA's damages provision, MCL 600.2922(6), to determine whether lost-earning-capacity damages were available under the act. The goal of statutory interpretation is to give effect to the Legislature's intent. *Sunrise Resort Ass'n, Inc v Cheboygan Co Rd Comm*, 511 Mich 325, 334; 999 NW2d 423 (2023). The "most reliable evidence of" the Legislature's intent is the words of the statute. *Klooster v City of Charlevoix*, 488 Mich 289, 296; 795 NW2d 578 (2011) (quotation marks and citation omitted). When the language of a statute is clear and unambiguous, the statute's plain meaning "must be enforced as written," and "[n]o further judicial construction is required or permitted." *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014) (quotation marks and citation omitted).

But a statute's text should not be read in isolation; rather, it should be read in accordance with the statute's context because " '[c]ontext is a primary determinant of meaning.' " *TOMRA of North America, Inc v Dep't of Treasury*, 505 Mich 333, 349; 952 NW2d 384 (2020), quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St Paul: Thomson/West, 2012), p 167. See also *Daher*, ___ Mich at ___; slip op at 5. A statute's context includes the "statute's history— the narrative of the statutes repealed or amended by the statute under consideration," which is not to be confused with a statute's legislative history. *Id*. at ___; slip op at 6, quoting *Dep't of Talent & Economic Dev/Unemployment Ins Agency v Great Oaks Country Club, Inc*, 507 Mich 212, 227; 968 NW2d 336 (2021) (quotation marks omitted). See also *Reading Law*, p 256. "[C]ourts must pay particular attention to statutory amendments, because a change in statutory language is presumed to reflect either a legislative change in the meaning of the statute itself or a desire to clarify the correct interpretation of the original statute." *Daher*, ___ Mich at ___; slip op at 6 (quotation marks and citation omitted).

The *Daher* Court interpreted the WDA with emphasis on its statutory history. To resolve the issue before it—whether lost-earning-capacity damages were available under the WDA— *Daher* first looked to the origins of the WDA. "The common law did not recognize a cause of action for the death of a human being caused by a wrongful act and did not permit the survival of actions for personal injuries," so, as *Daher* explains, our early Legislature adopted two acts that authorized such actions—"the survival act and the wrongful death act." *Id*. at ___; slip op at 7 (quotation marks and citation omitted). The wrongful death act was enacted in 1848, see 1848 PA

---

[3] *Thorn* held that loss-of-services damages were available under the WDA, but *Daher* explicitly overruled part of *Thorn*'s reasoning for this conclusion, and *Daher* was otherwise critical of the remainder of *Thorn*'s reasoning. See *Daher*, ___ Mich at ___ n 18; slip op at 14-15 n 18.

38, and it permitted recovery for "actual pecuniary loss suffered by one entitled to or receiving support from the deceased . . . ." *Daher*, ___ Mich at ___; slip op at 8 (quotation marks and citation omitted). The survival act, as amended by 1885 PA 113, allowed a decedent's cause of action to survive his or her death, so it "entitled the decedent's estate to whatever damages the decedent could have recovered." *Daher*, ___ Mich at ___; slip op at 7. This "included damages for the loss of the decedent's future earnings." *Id*. at ___; slip op at 7.

In 1939, the Legislature combined the survival act and the death act into a single wrongful death act (the WDA). See 1939 PA 297; *Daher*, ___ Mich at ___; slip op at 9. "Questions very quickly arose concerning the scope of damages available under the newly combined WDA," *id*. at ___; slip op at 10, which our Supreme Court addressed in *Baker v Slack*, 319 Mich 703; 30 NW2d 403 (1948). There, our Supreme Court clarified that the newly-combined WDA "specifically divide[d] the damages recoverable into three classes": (1) "pecuniary injury," (2) "reasonable medical, hospital, funeral and burial expenses," and (3) "the pain and suffering" of the decedent before death. *Id*. at 710. See also *Daher*, ___ Mich at ___; slip op at 11. The *Baker* Court then considered whether "pecuniary injury" included the loss of the decedent's future earnings, and concluded that it did not:

> The remaining question is, what is meant in the 1939 act by "pecuniary injury" to decedent's surviving spouse or next of kin. Does this include things so speculative and nebulous as the fondly nurtured hope of an inheritance, enhanced by redress for decedent's wrongful death, but suspended by the tenuous cord of decedent's possible intestacy? Assuredly not. In the *Olney Case* we recognized that, beyond compensation to a husband for loss of his wife's services, the right to recover for pecuniary loss must be predicated upon the existence of some next of kin having a legally enforceable claim to support or maintenance by deceased. [*Baker*, 319 Mich at 714.]

As *Daher* explained, this meant that, "with respect to the decedent's possible future income, only the damages associated with the pre-1939 death act were recoverable, i.e., loss of financial support." *Daher*, ___ Mich at ___; slip op at 12.

The WDA was amended after *Baker* was decided, and *Daher* addressed whether those amendments superseded *Baker*. The most significant amendment came in 1971 when the Legislature made the following changes shown in boldface and strikethrough:

> [I]n every [survival or death] action the court or jury may give such damages, as, the court or jury, shall deem fair and just, ~~with reference to the pecuniary injury resulting from such death,~~ **under all of the circumstances** to those persons who may be entitled to such damages when recovered ~~and also~~ **including** damages for the reasonable medical, hospital, funeral and burial expenses for which the estate is liable and reasonable compensation for the pain and suffering, while conscious, undergone by such deceased person during the period intervening between the time of the inflicting of such injuries and his death. **The amount of damages recoverable by civil action for death caused by the wrongful act, neglect or fault of another may also include recovery for the loss of the society and**

**companionship of the deceased.** [See MCL 600.2922(2), as amended by 1971 PA 65.]

The plaintiffs in *Daher* argued that the deletion of the phrase "pecuniary injury" changed the meaning of the statute so that it now permitted lost-earning-capacity damages. *Daher* rejected this argument because it was not consistent with the reason why the Legislature removed that phrase, explaining:

> The removal of the "pecuniary injury" phrase was not intended to change the relationship between survival actions and the WDA, i.e., that survival actions were subject to the damages limitations and other requirements of the WDA. Instead, we have held that the deletion of this phrase and the addition of the provision allowing damages for "loss of . . . society and companionship," which we described as "[t]he major revision" of the 1971 amendments, "can only be viewed as a clear rejection of" this Court's holding in *Breckon v Franklin Fuel Co*, 383 Mich 251; 174 NW2d 836 (1970), that damages for loss of companionship were not allowed under the WDA because they did not qualify as a "pecuniary injury." *Crystal v Hubbard*, 414 Mich 297, 322; 324 NW2d 869 (1982). [*Daher*, ___ Mich at ___; slip op at 18.]

*Daher* then addressed the Legislature's addition of the word "including" in the WDA's damages provision. The Court rejected the plaintiffs' argument that, by using this word, "the Legislature intended to convert what had long been an exhaustive list into an open-ended list of damages types left entirely to the discretion of the jury." *Id*. at ___; slip op at 20. To reach this conclusion, the Court relied on caselaw explaining that "[w]hen used in the text of a statute, the word 'includes' can be used as a term of enlargement or of limitation, and the word in and of itself is not determinative of how it is intended to be used." *Frame v Nehls*, 452 Mich 171, 178-179; 550 NW2d 739 (1996). Relying on the fact that the use of "including" was not decisive, the *Daher* Court concluded, "In light of the statutory history and caselaw discussed above, we do not believe that the insertion of 'including' demonstrates that the Legislature acted with sufficient clarity to overrule *Baker* and abrogate the common law." *Daher*, ___ Mich at ___; slip op at 21. The Court accordingly reaffirmed "*Baker*'s holding that lost-earning-capacity damages are not available under the WDA." *Id*. at ___; slip op at 26-27.

## B. ANALYSIS

Returning to the question of whether loss-of-services damages are available under the WDA following *Daher*, we follow *Daher*'s lead and begin with the statutory history of the WDA, specifically the act's historical treatment of damages for loss of household services. To begin, "[t]he common law did not recognize a cause of action for the death of a human being caused by a wrongful act . . . ." *Id*. at ___; slip op at 7. This means that, under the common law, a plaintiff could not bring a cause of action to recover damages for the lost services of a decedent. But that changed when the Legislature adopted the death act in 1848. As *Daher* explained, Michigan's 1848 death act was "a typical Lord Campbell's Act," and, as such, permitted recovery for "pecuniary loss," which included "household services the decedent would have provided to dependents had he lived." *Daher*, ___ Mich at ___, ___ n 10; slip op at 8, 8 n 10 (quotation marks and citation omitted).

-6-

After Michigan's death act was combined with the survival act in 1939, the newly-combined WDA continued to permit damages for "pecuniary injury." 1939 PA 297. See also *Daher*, ___ Mich at ___ n 12; slip op at 9-10 n 12. Our Supreme Court thereafter repeatedly reaffirmed that damages for loss of household services were recoverable under the WDA as part of damages for "pecuniary injury." See, e.g., *In re Olney's Estate*, 309 Mich 65, 84; 14 NW2d 574 (1944) ("But the surviving husband lost the services of Mrs. Bennett, and the value thereof less reasonable cost of her maintenance may be recovered in this action. *Gorton v Harmon*, 152 Mich 473; 116 NW 443; 15 Ann Cas 461. It should be noted that recovery in the cited case was under the provision of the Death Act that there could be recovery 'for pecuniary loss', and that the same provision is embodied in the 1939 Act. This element of damages is recoverable in the instant case."); *Strong v Kittenger*, 300 Mich 126, 138; 1 NW2d 479 (1942) ("We believe such instructions made clear to the jury that plaintiff could only recover for the pecuniary loss sustained by the husband by reason of the loss of his wife's services during his lifetime."); *Baker*, 319 Mich at 714 (observing that the phrase "pecuniary injury" was "identical" to the provision for compensation "in the old death act," and explaining that this phrase had been "uniformly" construed to include "the husband's right to recovery for loss of his wife's services (or parent's right to recovery for loss of minor child's services) after deduction of her maintenance costs"); *Thompson v Ogemaw Co Bd of Rd Comm'rs*, 357 Mich 482, 488; 98 NW2d 620 (1959) ("The [WDA] and Michigan case law interpreting it allow consideration of loss of services of a minor in determining pecuniary injury of a parent.").

As discussed above, the Legislature in 1971 removed the phrase "pecuniary injury" from the WDA and specified that damages under the act now "includ[ed]" damages "for the loss of the society and companionship of the deceased." MCL 600.2922(2), as amended by 1971 PA 65. But, as *Daher* reaffirmed, these changes " 'can only be viewed as a clear rejection of' [the Supreme] Court's holding in *Breckon v Franklin Fuel Co*, 383 Mich 251; 174 NW2d 836 (1970), that damages for loss of companionship were not allowed under the WDA because they did not qualify as a 'pecuniary injury.' " *Daher*, ___ Mich at ___; slip op at 18, quoting *Crystal*, 414 Mich at 322. Stated differently, the purpose of the 1971 amendment to the WDA (as repeatedly interpreted by our Supreme Court) was to clarify that, contrary to our Supreme Court's interpretation of the WDA, damages for loss of companionship were available under the act. Given this explanation for the removal of the phrase "pecuniary injury" from the WDA's damages provision, it is difficult to conclude that, by removing this phrase and adding the word "including," the Legislature intended to preclude litigants from recovering loss-of-services damages—damages that had been available under the act since its inception in 1848. See *Daher*, ___ Mich at ___; slip op at 19 (explaining that the word "including" is generally a term of enlargement); *Reading Law*, p 132 ("[T]he word *include* does not ordinarily introduce an exhaustive list . . . .").

Yet, *Daher* seemed to suggest that damages available under the WDA are limited to those forms of damages enumerated in the statute, which no longer includes "pecuniary injury." The *Daher* Court explained that *Baker*'s holding rested in part on that Court's determination "that the WDA only provides for enumerated damages." *Daher*, ___ Mich at ___; slip op at 17. And the *Daher* Court was "not persuaded that, by inserting the word 'including' into the statute as part of the 1971 amendments, the Legislature intended to convert what had long been an exhaustive list into an open-ended list of damages types left entirely to the discretion of the jury." *Id*. at ___; slip op at 20. In a footnote, the *Daher* Court more explicitly suggested that the WDA's list of damages is exhaustive:

In order to show that a previously exhaustive list is now to be construed as nonexhaustive, we would expect the Legislature to use more definitive language, such as "*including but not limited to*—or either of two variants, *including without limitation* and *including without limiting the generality of the foregoing*." *Reading Law*, p 132. Our opinion should not be interpreted to mean that these "longer, more explicit variations" are always required, *id*. at 133; only that more explicit language is required in this case given its unique facts and the extensive statutory history of the WDA and the caselaw interpreting it. [*Daher*, ___ Mich at ___ n 23; slip op at 21 n 23.]

While these excerpts, standing alone, support that the WDA's list of damages is exhaustive, we think that, in context, these portions of *Daher* mean only that, by using the word "including" in the damages provision of the WDA, the Legislature did not intend to *expand* the types of damages available under the act to damages that had never historically been available under the any version of Michigan's death act. The issue presented by this case, then, stands in stark contrast to the issue in *Daher*. Again, damages for loss of household services have been available under every version Michigan's wrongful death act since the first death act was enacted in 1848. See *id*. at ___ n 10; slip op at 8 n 10. This remained true after the Legislature combined the death act and the survival act into the WDA in 1939 because the WDA continued to permit recovery for "pecuniary injury." See *In re Olney's Estate*, 309 Mich at 84. When the Legislature removed the phrase "pecuniary injury" in 1971, it did so as part of specifying that damages available under the WDA "includ[ed]" damages for loss of companionship, contrary to our Supreme Court's holding in *Breckon*. See *Crystal*, 414 Mich at 322; *Daher*, ___ Mich at ___; slip op at 18. So, by concluding that loss-of-services damages remain available under the WDA following the 1971 amendments, we are not expanding the types of damages available under the act but merely concluding that the 1971 amendment did not disallow damages that were historically available under the act. Such an interpretation is consistent with the "unique facts and the extensive statutory history of the WDA and the caselaw interpreting it." *Id*. at ___ n 23; slip op at 21 n 23.

The historical treatment of loss-of-services damages under the WDA also makes the question presented in this case materially different from the one presented in *Daher*. As *Daher* explained, lost-earning-capacity damages were only available in actions brought under the survival act, while loss-of-services damages were historically available under Michigan's death act. *Id*. at ___; slip op at 7-8. After the acts were combined into the WDA, our Supreme Court in *Baker* held that lost-earning-capacity damages were unavailable under the new act. *Baker*, 319 Mich at 714. But our Supreme Court has never held that loss-of-services damages are unavailable under the WDA—indeed, after the death act and survival act were combined, our Supreme Court repeatedly reaffirmed that loss-of-services damages remained available under the newly-combined act. See, e.g., *In re Olney's Estate*, 309 Mich at 84; *Strong*, 300 Mich at 138; *Baker*, 319 Mich at 714; *Thompson*, 357 Mich at 488.

These dissimilarities place this case on different footing from *Daher*. *Daher* was tasked with deciding whether the Legislature's amendments to the WDA overruled or superseded the Supreme Court's decision in *Baker* such that lost-earning-capacity damages were made available under the WDA. See *Daher*, ___ Mich at ___; slip op at 2 ("We disagree that *Baker* has been overruled or superseded, and we hold that, like the earlier version of the WDA, the current version does not allow for recovery of lost future earnings."). As *Daher* explained, *Baker* effectively held

-8-

that, when the Legislature combined the death act and the survival act, it "revived the common-law rule barring recovery of" lost-earning-capacity damages. *Daher*, ___ Mich at ___; slip op at 16. So, the only way that lost-earning-capacity damages could be available under the WDA was if the Legislature abrogated this common-law rule. *Id*. at ___; slip op at 16. And to abrogate the common law, the Legislature must "speak in no uncertain terms." *Id*. at ___; slip op at 16 (quotation marks and citation omitted).

Loss-of-services damages do not face this same uphill battle because, again, they have always been available under the WDA, and the question before us is whether the Legislature intended to *disallow* loss-of-services damages when it removed the phrase "pecuniary injury" from the WDA's damages provision and specified that damages available under the act "includ[ed]" certain damages. Given our Supreme Court's repeated explanation for the removal of the phrase "pecuniary injury" and the fact that "including" is generally not a term of limitation, we conclude that the Legislature did not intend to make loss-of-services damages unavailable under the WDA when it amended the WDA's damages provision in 1971.

We therefore hold that loss-of-services damages remain available under the WDA following *Daher*, as they have been since Michigan's death act was enacted in 1848.

## IV. SPECULATIVE DAMAGES

Defendants contend that, even if loss-of-services damages are available under the WDA, plaintiff's request for loss-of-services damages should not go to a jury because plaintiff's requested loss-of-services damages were too speculative.

Before turning to the substance of defendants' argument, it is necessary to bring into focus the extent of plaintiff's request for loss-of-services damages. While plaintiff produced an expert report estimating her loss-of-services damages, plaintiff's expert only calculated damages for the time after Pionk would have turned 18, and plaintiff has never argued that she was entitled to loss-of-services damages for the period that Pionk would have been under 18. We therefore do not interpret the parties' arguments as addressing that separate issue, i.e., whether plaintiff can recover loss-of-services damages for the period before Pionk would have turned 18.

With that in mind, defendants contend that plaintiff's loss-of-services damages are too speculative to be recoverable because, given that Pionk was only a few days old when he passed away, what services he would have performed after the age of 18, if any, cannot be reasonably determined.

### A. SPECULATIVE DAMAGES GENERALLY

In *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518; 687 NW2d 143 (2004), this Court addressed a defendant's argument that the plaintiff's damages in a medical-malpractice action were too speculative to be recoverable. Like here, the defendant's argument in *Ensink* came before this Court in a motion for summary disposition filed before trial. See *id*. at 522-523. To address the defendant's argument, this Court surveyed cases that explained what it meant for damages to be too speculative to be recoverable, and it recapped some of the relevant caselaw as follows:

"Recovery is not permitted in a tort action for remote, contingent, or speculative damages." *Theisen v Knake*, 236 Mich App 249, 258; 599 NW2d 777 (1999), citing *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 33; 436 NW2d 70 (1989). A more complete statement of this point of law was made in *Sutter v Biggs*, 377 Mich 80, 86-87; 139 NW2d 684 (1966):

> The general rule, expressed in terms of damages, and long followed in this State, is that in a tort action, the tort-feasor is liable for all injuries resulting directly from his wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and are such as, according to common experience and the usual course of events, might reasonably have been anticipated. Remote, contingent, or speculative damages are not considered in conformity to the general rule. *Van Keulen & Winchester Lumber Co v Manistee & Northwestern Railroad Co*, 222 Mich 682[; 193 NW 289 (1923)]; *Woodyard v Barnett*, 335 Mich 352[, 358; 56 NW2d 214 (1953)]; and *Fisk v Powell*, 349 Mich 604[, 613; 84 NW2d 736 (1957)]. See, also, *McLane, Swift & Co v Botsford Elevator Co*, 136 Mich 664 [99 NW 875 (1904)]; and *Cassidy v Kraft-Phenix Cheese Corp*, 285 Mich 426 [280 NW 814 (1938)].

> Further, to render a wrongdoer liable in damages in a tort action where the connection is not immediately between the injurious act and the consequences, such nearness in the order of events and closeness in the relation of cause and effect must subsist, so that the influence of the injurious act would predominate over that of other causes, and concur to produce the consequences or be traceable to those causes. *Woodyard v Barnett*, *supra*.

Additionally, in *Wendt v Auto-Owners Ins Co*, 156 Mich App 19, 26; 401 NW2d 375 (1986), this Court cautioned that "questions of what damages might be reasonably anticipated is a question better left to the factfinder." In *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 108; 535 NW2d 529 (1995), this Court stated:

> A party asserting a claim has the burden of proving its damages with reasonable certainty. *S C Gray, Inc v Ford Motor Co*, 92 Mich App 789, 801; 286 NW2d 34 (1979). Although damages based on speculation or conjecture are not recoverable, *Sutton v Biggs*, 377 Mich 80, 86; 139 NW2d 684 (1966), damages are not speculative merely because they cannot be ascertained with mathematical precision. *Godwin v Ace Iron & Metal Co*, 376 Mich 360, 368; 137 NW2d 151 (1965). It is sufficient if a reasonable basis for computation exists, although the result be only approximate. *McCullagh v Goodyear Tire & Rubber Co*, 342 Mich 244, 255; 69 NW2d 731 (1955). *Moreover, the certainty requirement is relaxed*

*where the fact of damages has been established and the only question to be decided is the amount of damages. Bonelli v Volkswagen of America, Inc*, 166 Mich App 483, 511; 421 NW2d 213 (1988). [Emphasis supplied.]

Similarly, in *Purcell v Keegan*, 359 Mich 571, 576; 103 NW2d 494 (1960), our Supreme Court observed:

The trial court spoke, also, of "speculation" and "guess" as to the amount of overtime. But where injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, "in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable." Particularly is this true where it is defendant's own act or neglect that has caused the imprecision.

[*Ensink*, 262 Mich App at 524-525 (alterations in *Ensink*).]

The problem of speculative damages is particularly acute in the context wrongful-death actions due to the nature of damages in such cases, as our Supreme Court has explained:

It must be recognized at this point that some uncertainty of proof is implicit in the terms of the statute we seek to interpret. The pecuniary injury contemplated by the [wrongful death] act requires consideration of the probability of the happening of events which, as of the date of trial, have been permanently barred by the intervention of death.

Briefly put, there can be no such thing as direct evidence of future support when the supporter is dead. *This fact alone guarantees that no testimony can be offered in proof of otherwise probable future support or contribution which completely avoids speculation.* Indeed the only certainty in relation to such testimony is that no one will ever be able to prove or disprove its validity. It is perhaps for this reason that the statute places emphasis upon "such damages, as, the court or jury, shall deem fair and just."

Lack of proofs of an exact quality should not, however, be allowed to defeat the legislative purpose. The Michigan wrongful death act is a remedial measure designed to alleviate the harsh provisions of the common law which has generally been interpreted as forbidding compensation for wrongful death. [*Thompson*, 357 Mich at 489-490 (emphasis added).]

B. *ZEHEL*

Defendants primarily rely on *Zehel v Nugent*, 344 Mich App 490; 1 NW3d 387 (2022), vacated in part by *Zehel v Nugent*, 12 NW3d 396 (2024), in support of their argument that

-11-

plaintiff's loss-of-services damages in this wrongful-death action are too speculative to be recoverable.

*Zehel* was a wrongful-death action in which this Court addressed the plaintiff's demand for lost-earning-capacity damages before our Supreme Court decided *Daher*. The *Zehel* Court concluded in relevant part that the plaintiff could not recover lost-earning-capacity damages for a decedent who died shortly after birth because such damages were too speculative to be recoverable. *Id*. at 509. *Zehel* noted that there was "little clear authority in Michigan" discussing how lost-earning-capacity damages in cases involving infant-decedents should be calculated, so it turned to how the issue had been addressed by other states. *Id*. at 506-507. According to *Zehel*, other states considering whether a plaintiff could recover lost-earning-capacity damages for a child decedent looked to characteristics like the child's age, the child's sex, physical and mental characteristics of the child, the child's educational and career plans, and the conduct of the child's siblings. *Id*. at 507-509. *Zehel* concluded that, because there was little such evidence in the case before it, and because such evidence could not be developed due to the child's death at such an early age, any lost-earning-capacity damages were speculative, explaining:

> We think the above cases establish that a child's expected future earning potential is not *inherently* too speculative to permit recovery. However, the record must permit some reasonable basis for personalizing an estimation specific to that particular child. In this case, tragically, there is simply no way to know anything about Rowyn's [the child-decedent] interests, aspirations, personality, strengths and weaknesses, academic performance, or any other characteristic that could be extrapolated. Rowyn was born prematurely and may have been conscious for two hours, if that. Rowyn never had the chance to display any individual personality whatsoever, and we think it too speculative to extrapolate from her parents or sibling. Unfortunately, on these facts, we must agree with defendants that there is no possible evidence of *Rowyn's* potential for future earnings.
>
> We are therefore constrained to conclude that defendants are entitled to summary disposition in their favor as to plaintiff's claims for lost future earning potential. [*Id*. at 509.]

*Zehel* is not persuasive for the simple reason that it concerned lost-earning-capacity damages, and loss-of-services damages have, historically, been calculated differently than lost-earning-capacity damages.

In *Courtney v Apple*, 345 Mich 223, 225; 76 NW2d 80 (1956), a child was killed shortly before his third birthday. While the issue in *Courtney* did not concern how to calculate loss-of-services damages in such circumstances, the Court nevertheless explained the minimal proof needed to submit the question of pecuniary-loss damages to a jury. The majority explained:

> On behalf of plaintiff proofs were introduced as to the respective ages and health of the parents of the child, and as to his age, health and disposition. Otherwise it does not appear that the jury had before it evidence to assist in determining to what extent the value of services which the child, had he lived, would have rendered to his father between the date of death and his attaining

majority, exceeded, if at all, the cost that the father would have incurred in maintaining the child during said period. The determination of this matter was left to the jury under an instruction that permitted the members to draw on their own experiences in life. *The evidence was sufficient to require submission of the question of the parent's damages to the jury*, as this Court has recognized in prior decisions. [*Id*. at 229-230 (opinion of the Court) (emphasis added).]

One such decision was *Black v Michigan Cent R Co*, 146 Mich 568; 109 NW 1052 (1906), which the *Courtney* majority described as follows:

> There the action was brought to recover damages for the alleged negligent killing of plaintiff's son, a boy seven years and one month of age. Plaintiff had judgment and defendant appealed claiming, among other reasons advanced for reversal, that there was no evidence to support a finding that pecuniary injury had been sustained. *Testimony was introduced, as in the instant case, to show the age and condition of health of each of the parents and also the health and disposition of the boy. The primary question at issue was whether such proof was sufficient to justify submitting the issue of damages to the jury*, with the right to the members thereof to rely on their own judgment and experiences. Upon this question the Court said:
>
> > 'The jurors have all been boys. The average juror knows the conditions which surround a boy in a family like that of plaintiff. We think it cannot be said as a matter of law that there was no basis upon which to find a verdict for pecuniary loss.'
>
> *The Court found no reversible error and concluded that the finding of the jury with reference to the damages sustained should not be set aside*. [*Courtney*, 345 Mich at 233 (emphasis added).]

*Courtney*'s discussion of pecuniary-loss damages is relevant for present purposes because loss-of-services damages were available under the WDA as part of pecuniary-loss damages when *Courtney* was decided. See, e.g., *In re Olney's Estate*, 309 Mich at 84. And cases like *Courtney* are useful for contextualizing *Zehel* because they show how calculating lost-earning-capacity damages differs from calculating loss-of-services damages. *Zehel* reasoned that the plaintiff's claim for lost-earning-capacity damages were too speculative for the child-decedent because the child's "interests, aspirations, personality, strengths and weaknesses, academic performance, or any other characteristic" could not be extrapolated because the child was too young to have such characteristics when he died. *Zehel*, 344 Mich App at 509. But those considerations are not necessarily relevant for determining loss-of-services damages. As *Courtney* explained, a plaintiff could recover loss-of-services damages for a deceased child through the child's "21st birthday" by presenting evidence "as to the respective ages and health of the parents of the child, and as to [the child's] age, health and disposition." *Courtney*, 345 Mich at 229.

### C. *THOMPSON*

This still leaves unresolved the question whether a plaintiff-parent in a wrongful-death action involving an infant-decedent can recover loss-of-services damages past when the child

would have reached the age of majority. A loosely similar issue was addressed by our Supreme Court in *Thompson*, on which defendants primarily rely. There, the child was 15 years old when she was killed. *Thompson*, 357 Mich at 484. After the plaintiff received a favorable verdict, the trial court granted the defendant a new trial because the court believed it erred "by allowing the jury to consider loss of possible contributions, due to parental dependency, which the minor child might otherwise have made subsequent to her 21st birthday." *Id*. at 485. Our Supreme Court framed the question presented as follows: "In the event of the wrongful death of a minor, may the jury consider and award damages for 'pecuniary injuries' suffered by the surviving parents after the period of the child's minority?" *Id*.[4]

To answer this question, the *Thompson* majority first noted that the WDA and caselaw "interpreting it allow consideration of loss of services of a minor in determining pecuniary injury of a parent," but believed that there was "a clear distinction between the services of a minor and the contributions of an adult son or daughter to a dependent parent." *Id*. at 488. Still, the Court had previously held that "proofs that a son 23 years of age had voluntarily undertaken and continued support" of "a dependent parent" was sufficient "to allow the jury to consider whether or not there was reasonable expectation of continued support in determining damages arising from the son's death." *Id*. at 489, citing *Judis v Borg-Warner Corp (Norge Div)*, 339 Mich 313; 63 NW2d 647 (1954) and *MacDonald v Quimby*, 350 Mich 21; 85 NW2d 157 (1957). *Thompson* concluded that our Supreme Court's past cases, as well as cases from other states, supported that "the test" for pecuniary-loss damages was "reasonable expectation of support," regardless of whether the child died before or after the age of majority. *Thompson*, 357 Mich at 489.

*Thompson* obviously did not address wrongful-death actions involving infant-decedents, nor does any of the language it uses suggest that there is an exception to its rule. In a much earlier case, however, our Supreme Court adopted a rule similar to the one in *Thompson* and noted a possible exception for "very young children." In *Cooper v Lake Shore & M S R Co*, 66 Mich 261, 263-264; 33 NW 306 (1887), an 11-year-old child was killed by a train, and her parents brought suit to recover damages for their pecuniary loss. See *id*. at 268-270. The relevant dispute before the Court was whether the parents could recover damages for services that the decedent may have provided to her parents after she was a minor. The Court held that the parents could not, explaining:

> The particular objection urged against those instructions are that the damages are not limited to minority of the child, covering a period of 10 years. Compensation for loss of services during her minority, he concedes, is proper for the consideration of the jury; but he insists that the jury may not take into consideration such other pecuniary benefits as the parents might reasonably be expected to realize had she lived for the balance of her probable duration of life, not longer than theirs. What other pecuniary benefits the parents might reasonably be expected to realize the learned judge does not explain to the jury. He tells them

---

[4] It was undisputed in *Thompson* that the plaintiff was entitled to damages for the services that the decedent child would have provided through her 21st birthday. See *id*. at 486; *id*. at 497 (CARR, J., dissenting).

that they should give such damages as fairly represents the value or chance of the pecuniary benefit which the father and mother lose by the death of their daughter. Here was a broad field of chance and probabilities laid open before the jury through which they could roam without limit. They were permitted to speculate upon the future, and consider the probabilities or the possibilities of its unknown and unknowable contingencies; to consider and guess at what might occur had the daughter not been killed, and had lived to an age measured by the probable duration of the life of a person 11 years of age. They were given the data of a healthy girl of 11 years of age, born of poor parents, living with and being cared for by her grandmother; and from this they were required to solve the mighty problem of a life whose future was unknown, and from its unfathomable depths to figure out the chances of pecuniary benefits the parent of that child would have received had she lived past the age of majority. The jury, of course, must determine whether she would remain single or marry. If she married, she might marry a husband in the same humble walk of life as herself. He might be without means, or he might have a competency of this world's goods; and the daughter might or might not be in a position, and have the means and desire, to make presents to her parents to a greater or less extent. Or she might marry a millionaire, and be able and willing to supply her parents with all the luxuries of life. Or she might remain single, and be compelled to toil from morning until night to earn her livelihood. Who can place a pecuniary estimate upon chances such as these? It is evident at a glance that any estimate or value placed upon events so uncertain must be without any satisfactory basis to rest upon.

The statute authorizes the jury, in every case of this kind, to give such amount of damages as they shall deem fair and just to the persons who may be entitled to the same when recovered. Under this statute the jury are not warranted in giving damages not founded upon the testimony, or beyond the measure of compensation for the injury inflicted. They cannot give damages founded upon their fancy, or based upon visionary estimates of probabilities or chances. The rule of damages in actions for torts do not apply to actions of this kind. The statute gives the right to damages; but it has been held, with rare exceptions, that they must be confined to those damages which are capable of being measured by a pecuniary standard.

In actions brought under the statute, where the parents are the persons entitled to damages, if the evidence shows that the deceased had been in the habit of making contributions from his own means to his parents, their damages might be based and estimated upon the customary contributions of deceased proven before the jury. *But this rule is not applicable in the case of a very young child who has never made any contributions, and when it is impossible to show that she ever will.* [*Id*. at 270-272 (citations omitted; emphasis added).]

*Cooper* is applicable here because it discusses pecuniary-loss damages, which include loss-of-services damages. See, e.g., *In re Olney's Estate*, 309 Mich at 84. And the rule in *Cooper* is reminiscent of the rule announced in *Thompson*. But what is most notable about *Cooper* is the portion emphasized above—that the rule it discussed was "not applicable in the case of a very

young child who has never made any contributions, and when it is impossible to show that she ever will." *Id*. at 272.

## D. APPLICATION

On the basis of all this caselaw, we reject defendants' argument that plaintiff's demand for damages for services that Pionk would have provided after the age of 18 is too speculative to be recoverable. We arrive at this conclusion due to several considerations. Fundamentally, though, our conclusion is based on the fact that the lack of clarity here is due to the nature of the requested damages, and we believe that a jury is better suited to sort out the contested issues as factual matters instead of this Court deciding them as matters of law.

Defendants, relying on *Thompson*, 357 Mich at 489, make much of the fact that plaintiff cannot establish a "reasonable expectation" that Pionk would have provided her services after he reached the age of majority. We conclude, however, that the rule announced in *Thompson* "is not applicable in the case of a very young child" when "it is impossible to show" such a reasonable expectation under the circumstances. *Cooper*, 66 Mich at 272.

If we are wrong and *Thompson*'s rule applies, plaintiff has a much steeper climb. We are inclined to agree with defendants that there is simply no evidence from which a jury could find that plaintiff had a "reasonable expectation of support," *Thompson*, 357 Mich at 489, which will be true in virtually every case involving an infant decedent.

That said, as *Thompson* noted, calculating damages in a wrongful-death action will always require some speculation because of the very nature of the claims involved. See *id*. at 490. The degree of speculation will of course be greatest when the decedent died during infancy, but this uncertainty alone should not defeat the plaintiff's claim. See *id*. Given this, we agree with plaintiff that the following principle stated in *Purcell*, 359 Mich at 576, controls:

> [W]here injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, "in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable." *Particularly is this true where it is defendant's own act or neglect that has caused the imprecision*. [Emphasis added.]

At this point in the proceedings, plaintiff has established "some degree" of loss-of-services damages for the time after Pionk would have turned 18—she produced an expert report estimating those damages.[5] And if defendants are indeed the cause of Pionk's early death, then, as plaintiff rightly argues, defendants' negligent conduct is the reason that we have such little information from which to extrapolate plaintiff's loss-of-services damages, and the resulting lack of precision

---

[5] We offer no opinion about this report beyond noting that it has been provided and that it supports plaintiff's claim for loss-of-services damages. Defendants moved for partial summary disposition shortly after this report was produced, and, so far, they have only disputed the report's factual assertions.

in the calculation of plaintiff's damages will not defeat plaintiff's claim. We accordingly decline to disallow plaintiff's requested loss-of-services damages as a matter of law at this early point in the proceedings.

## V. CONCLUSION

Our Supreme Court in *Daher* held that lost-earning-capacity damages are unavailable under the WDA, so the trial court erred by denying defendants' motion to the extent that it asked the court to dismiss plaintiff's claims requesting lost-earning-capacity damages. We hold, however, that following *Daher*, loss-of-services damages remain available under the WDA. We further hold that a plaintiff in a WDA action involving an infant-decedent is not barred as a matter of law from recovering loss-of-services damages for the time after the decedent would have reached the age of 18.

Reversed in part, affirmed in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Matthew S. Ackerman