*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WIXIE ACQUISITIONS, LLC, SIMONE MAURO, SALVATORE DIMERCURIO, WIXIE ACQUISITIONS, LLC, Assignee of the ASSETS OF CLUB GOLF, INC., and SERGIO GESUALE,

Plaintiffs-Appellants/Cross-Appellees,

v

ANTHONY MARROCCO, ANTHONY FANELLI, GIOVANNI CRISPIGNANI, LISA CRISPIGNANI, Trustee of the GIOVANNI CRISPIGNANI IRREVOCABLE TRUST, PAUL CRISPIGNANI, Trustee of the GIOVANNI CRISPIGNANI IRREVOCABLE TRUST, LOUIS MOLLICONE, MATTHEW MOLLICONE, and CLUB GOLF PROPERTIES, LLC,

Defendants-Appellees/Cross-Appellants.

UNPUBLISHED
December 02, 2025
3:20 PM

No. 369230
Macomb Circuit Court
LC No. 2020-003771-CB

Before: K. F. KELLY, P.J., and BORRELLO and CAMERON, JJ.

PER CURIAM.

Plaintiffs, Wixie Acquisitions, LLC ("Wixie"), Simone Mauro, Salvatore DiMercurio, Sergio Gesuale, and Wixie Acquisitions, LLC, as assignee of the Assets of Club Golf, Inc., appeal by right the trial court's order following a jury trial, which entered a judgment of no cause of action on plaintiffs' claims and entered judgment in favor of defendants, Anthony Marrocco, Anthony Fanelli, Giovanni Crispignani, Lisa Crispignani and Paul Crispignani, as trustees of the Giovanni Crispignani Irrevocable Trust, Louis Mollicone, Matthew Mollicone, and Club Golf Properties,

LLC ("CGP").[1] On appeal, plaintiffs challenge the trial court's May 23, 2022 partial grant of summary disposition in favor of defendants and the trial court's December 13, 2023 denial of plaintiffs' motion for judgment notwithstanding the verdict. On cross appeal, defendants challenge the trial court's February 5, 2024 order denying case-evaluation sanctions. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from a longstanding conflict between former business partners, which has resulted in protracted litigation and multiple appeals to this Court. This Court summarized some of the relevant factual background in *Jode Investments, LLC v Burning Tree Props, LLC*, unpublished per curiam opinion of the Court of Appeals, issued April 17, 2014 (Docket No. 310957), pp 2-3:

> In September 2004, Marrocco, Fanelli, Mauro, DiMercurio, Sergio Gesuale, and Ralph Patti formed two limited liability companies: Burning Tree Properties, LLC ["BTP"] and Burning Tree Investors, LLC ["BTI"] (collectively the Burning Tree entities). Marrocco and Fanelli did not participate in the formation of the Burning Tree entities in their individual capacities; instead, they caused their own limited liability company—Jode Investments ["Jode"]—to form the new entities along with the other members. Eventually [Jode], Mauro, DiMercurio, and Gesuale each owned 25% of the Burning Tree entities. The members formed the Burning Tree entities to purchase and operate the Burning Tree Golf and Country Club [the "golf course"]; specifically, they organized [BTP] to purchase the golf course's real property and organized [BTI] to operate the golf course and country club.

> The Burning Tree entities financed the purchase of the golf course with a $3,360,000 loan from Fifth Third Bank. To secure the loan, [BTP] granted Fifth Third a mortgage on its real property and [BTI] guaranteed the loan and provided Fifth Third with a security agreement covering all of its personal property, including its liquor license. Marrocco, Fanelli and the individual members of the Burning Tree entities also each personally guaranteed the loan. The note obligated the Burning Tree entities to make a balloon payment in January 2009, which they did not make.

> Fifth Third foreclosed against Burning Tree's real property by advertisement and purchased the property at a foreclosure sale held in October 2009. Fifth Third bid $1,500,000 for the property and recorded its deed in November of that same year. The remaining debt after the foreclosure was approximately $2 million.

---

[1] This appeal primarily concerns plaintiffs Mauro, DiMercurio, and Gesuale (collectively, "individual plaintiffs"), and defendants Marrocco and Fanelli (collectively, "individual defendants"). The trial court dismissed all defendants except for Marrocco, Fanelli, and CGP on April 21, 2023.

In November 2009, Fifth Third sued the Burning Tree entities, DiMercurio, Fanelli, Gesuale, Marrocco, Mauro, and Patti. Fifth Third alleged that the Burning Tree Investors, DiMercurio, Fanelli, Gesuale, Marrocco, Mauro, and Patti breached their guaranties. It also alleged the right to take possession of [BTI's] personal property in partial satisfaction of the remaining debt. Fifth Third asked the circuit court to appoint a receiver to preserve the personal property and any profits from the operation of the golf course.

In April 2010, Marrocco and Fanelli entered into a settlement agreement with Fifth Third. Marrocco and Fanelli agreed to pay Fifth Third $2.1 million and to release all claims against Fifth Third. In exchange, Fifth Third agreed to dismiss its civil claims against Marrocco and Fanelli "with prejudice" and without impairing Fifth Third's right to proceed against the other guarantors. Fifth Third also agreed to quit claim its interest in "the Burning Tree Property" or issue a certificate of redemption to an entity to be named by Marrocco and Fanelli. Finally, Fifth Third agreed to terminate its financing statements under the Uniform Commercial Code (UCC) against [BTI's] personal property and discharge any interest in [BTI's] liquor license. Marrocco and Fanelli also represented that they intended to create an entity to acquire [BTI's] remaining assets.

Also in April 2010, members holding a 70% interest in [BTP] (Marrocco, on behalf of [Jode], Mauro, and DiMercurio) caused [BTP] to assign all of its "right, title, and interest" in the real property, including its redemption rights, to [CGP]. Under the terms of the agreement, the manager of [BTP] had to execute a quit claim deed to [CGP].

[CGP] paid $2,100,000 to Fifth Third as part of the settlement between Fifth Third, Fanelli, and Marrocco in May 2010. Fifth Third executed a 'redemption certificate' acknowledging that [CGP] had redeemed the real property in that same month. The redemption was not recorded until February 2011. Fifth Third also stipulated to the dismissal of its claims against the Burning Tree entities, Marrocco, Fanelli, and Patti.

In July 2010, Fifth Third settled with Mauro and DiMercurio. Under the settlement agreement, Mauro and DiMercurio agreed to each execute a deficiency note for $70,000 to cover their personal guaranties. In exchange, Fifth Third agreed that the settlement would resolve its claims against Mauro and DiMercurio. The circuit court dismissed Fifth Third's claims against Mauro and DiMercurio later that same month.

In January 2011, [Jode], [CGP], and Club Golf Investors ["CGI"] sued the Burning Tree entities, Mauro, DiMercurio, and Gesuale.[2]

---

[2] In April 2010, defendants formed new entities to own and operate the golf course, including CGI, which owned the personal property and liquor license, and CGP, which owned the real property.

During the course of the above-described proceedings, the trial court granted a motion to dissolve the Burning Tree entities in 2012, *id*. at 6, and ordered Mauro to sign an assignment of BTI's personal assets to CGI, *id*. at 5-6. In 2014, this Court reversed the trial court order requiring Mauro to transfer BTI's personal property to CGI, stating,

> We reverse the trial court's order compelling [BTI] to transfer its personal property, including its liquor license, to [CGI], but only to the extent that the court ordered the transfer without compensation. We further remand this case to the trial court to conduct a hearing to determine the value of those assets. After determining the value, the trial court shall amend its order to provide that [CGI] must pay that amount to [BTI's] members; the order shall provide that each member is entitled to that proportion of the payment that the member would have been entitled to under the membership agreement as of the date of the original order compelling the transfer. [*Id*. at 14.]

In September 2016, on remand, the trial court entered an opinion and order (the "2016 judgment") determining that the assets of BTI were $542,500.24, and that Mauro, DiMercurio, Gesuale, and Jode were each entitled to receive 25% of that amount. The case was subject to another appeal in 2018, and again remanded for the trial court "to consider [a] $396,176 loan receivable as an asset of BTI," and apportion it consistent with the instructions in the 2016 judgment. *Jode Investments, LLC v Burning Tree Props, LLC*, unpublished per curiam opinion of the Court of Appeals, issued February 27, 2018 (Docket No. 335299), p 21. In March 2018, the trial court entered another judgment (the "2018 judgment"), which amended the 2016 judgment to reflect that the value of BTI's assets was $938,676.24, again, with Mauro, DiMercurio, Gesuale, and Jode to each receive 25%.

Plaintiffs thereafter attempted to pursue the outstanding judgment through garnishments, but the garnishments did not satisfy the money owed on the judgment. In June 2019, individual plaintiffs each obtained orders to seize assets from CGI. They were ultimately unable to seize the assets pursuant to the orders because that same week, CGI entered into an assignment for the benefit of creditors ("ABC"). The purpose of the ABC proceedings was to gather CGI's assets and put them up for auction in order to pay defendants' creditors. The ABC proceedings took place from June 2019 to December 2019, and defendants selected Gene Kohut to serve as the assignee of CGI's property. Although Kohut was the assignee throughout the proceedings, individual defendants continued to manage the golf course operations.

Individual plaintiffs eventually formed another company, Wixie. In December 2019, Kohut held an auction of CGI's assets, which Wixie purchased for $225,000. Wixie signed a general assignment agreement for the purchase of CGI's assets, which included an appraisal summary of assets ("appraisal summary"). When Mauro eventually received the keys to the property and took possession of the golf course club house, he realized that much of the inventory listed on the appraisal summary was missing. Further, while the money paid at the auction was intended to satisfy the 2018 judgment against CGI, it failed to satisfy the full amount owed.

In October 2020, plaintiffs filed this action against defendants, alleging two counts of fraudulent transfer, one count of statutory and common-law conversion, one count of tortious interference with contractual relationships and advantageous business expectancies, and one count

requesting the trial court to enjoin defendants from making unauthorized transfers of assets or property. Plaintiffs alleged that defendants wrongfully removed items listed on the appraisal summary from the golf course to diminish the value of the property, interfered with Wixie's operation of the golf course by filing collection lawsuits against golf course members, brought dogs onto the premises and allowed them to eat from club house china in front of members, and drove cars on the golf course. They also alleged that defendants wrongfully transferred assets out of CGI to prevent individual plaintiffs from being paid pursuant to the judgment.

In March 2022, defendants moved for summary disposition on all of plaintiffs' claims. With respect to plaintiffs' tortious interference claim, defendants argued that dismissal was appropriate under MCR 2.116(C)(8) and (10) because plaintiffs failed to prove any actual damages based on their allegations that defendants filed collection lawsuits against golf course members, allowed dogs on the property, and drove a car on the golf course. In May 2022, the trial court issued a written opinion and order partially granting defendants' motion for summary disposition. The trial court dismissed plaintiffs' tortious interference claim under MCR 2.116(C)(10), noting that plaintiffs failed to provide evidence related to dogs on the premises, Marrocco driving his car on the golf course, and defendants filing lawsuits against golf course members, and consequently, failed to provide evidence of any damages suffered. The trial court also granted summary disposition with respect to some aspects of plaintiffs' conversion claim, but otherwise denied defendants' motion.

In April 2023, a four-day jury trial commenced on plaintiffs' remaining claims. At trial, defendants moved for a directed verdict, which the trial court partially granted, limiting the remaining triable claims to fraudulent transfer against Marrocco, Fanelli, and CGP; and conversion against Marrocco only. The court also narrowed the scope of the remaining issues, noting that plaintiffs' conversion claim was based on the property that Mauro claimed was missing from the appraisal summary, and that the fraudulent transfer claims were proceeding based on (1) a $2,000 increase in monthly rent payments from CGI to CGP, (2) a $1,000 monthly management fee paid to a business that Marrocco owned, and (3) an alleged payment to Jode of its outstanding portion of the 2018 judgment.

The jury heard testimony from Mauro, Fanelli, and golf-course employee Dale Bauer. As to plaintiffs' conversion claim, Mauro testified that numerous items listed on the appraisal summary were missing from the premises. However, when asked if he had evidence that Marrocco or Fanelli took the property, he responded, "I don't have evidence, but who else would've?" Mauro admitted that, aside from the fact that items were missing from the appraisal summary and that individual defendants were managing the golf course during the ABC proceedings, he did not have further evidence to establish that defendants took the allegedly converted items. Bauer testified that several contested items remained on the premises. As to the fraudulent transfer claims, Fanelli testified that in 2015, CGP increased CGI's monthly rent payment from $10,000 to $12,000 as part of the "ordinary course of business increases." Fanelli clarified that he and Marrocco collected a monthly management fee as minimal compensation for taking a more hands-on role in managing CGI, and beginning in 2016, Marrocco collected his $1,000 monthly payments through his company, Evergreen Management. Fanelli also testified that Jode was not paid through the assignment and was not listed as a creditor in the ABC proceedings for business-related reasons.

The jury ultimately determined that there was no cause of action as to plaintiffs' claims. The trial court entered judgment in accordance with the jury verdict in May 2023. Later that month, plaintiffs moved for judgment notwithstanding the verdict under MCR 2.610, or alternatively, for a new trial under MCR 2.611, arguing that they proved their conversion and fraudulent transfer claims by a preponderance of the evidence. Following a hearing, the trial court denied plaintiffs' motion in a December 2023 opinion and order.

In January 2024, plaintiffs filed their claim of appeal in this Court. Shortly thereafter, defendants moved in the trial court for case-evaluation sanctions, arguing that despite the elimination of MCR 2.403(O), which allowed for case-evaluation sanctions, the rule was still applicable to the instant case under MCR 1.102. In February 2024, following a hearing, the trial court denied defendants' request for case-evaluation sanctions. Defendants thereafter filed their claim of cross-appeal in this Court.

## II. SUMMARY DISPOSITION

Plaintiffs argue that the trial court erred by granting defendants' motion for summary disposition with respect to plaintiffs' tortious interference claim. We disagree.

### A. STANDARDS OF REVIEW

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Chisholm v State Police*, 347 Mich App 646, 651-652; 16 NW3d 563 (2023). While defendants filed their motion pursuant to MCR 2.116(C)(8) and (10), in granting the motion, the trial court relied on documentary evidence and explicitly confined its analysis to MCR 2.116(C)(10). We limit our analysis in the same manner as the trial court and only address whether there is a genuine issue of material fact under MCR 2.116(C)(10). See *Tripp v Baker*, 346 Mich App 257, 262; 12 NW3d 45 (2023) (limiting a summary disposition analysis where it was "clear the trial court decided the respective motions under [MCR 2.116(C)(10)]").

"A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the claim and is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Chisholm*, 347 Mich App at 652. "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds might disagree." *Id.* On review, this Court "consider[s] the documentary evidence in the light most favorable to the nonmovant." *Id.*

### B. ANALYSIS

On appeal, plaintiffs argue that the trial court erred by dismissing their tortious interference claim based on a lack of evidence because defendants failed to dispute that they filed collection lawsuits against golf course members and failed to dispute that Marrocco allowed his dogs onto the premises and drove his car on the golf course.

Michigan recognizes a distinction between claims for tortious interference with contractual relations and tortious interference with a business relationship or expectancy as follows:

In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy. The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant. The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. [*Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 89-90; 706 NW2d 843 (2005) (citations omitted).]

Under the burden-shifting framework of MCR 2.116(C)(10), plaintiffs were required to present documentary evidence to establish a genuine issue of material fact with respect to the above elements:

[T]he moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. [*Quinto v Cross & Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996) (citations omitted).]

Plaintiffs failed to present documentary evidence to establish a genuine issue of material fact on their tortious interference claim. Plaintiffs' claim was premised on defendants allegedly filing postassignment collection lawsuits for unpaid dues against golf course members, and Marrocco allowing his dog onto the premises and driving his car on the golf course, both of which damaged plaintiffs' goodwill. Notably, plaintiffs failed to present any documentary evidence in support of these allegations. With regard to tortious interference with a contract, plaintiffs presented no evidence establishing the existence of a contract that was breached. As for tortious interference with a business relationship or expectancy, plaintiffs presented no documentary evidence to establish that defendants intentionally interfered with a valid business relationship, or any damages resulting from defendants' alleged misconduct. See *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518, 524; 687 NW2d 143 (2004) ("Recovery is not permitted in a tort action for remote, contingent, or speculative damages.") (quotation marks and citations omitted). Given plaintiffs' failure to establish a genuine issue of material fact through documentary evidence on their tortious interference claim, the trial court did not err by partially granting defendants' motion for summary disposition.

III. JUDGMENT NOTWITHSTANDING THE VERDICT

Plaintiffs next argue that the trial court erred by denying their motion for judgment notwithstanding the verdict, or alternatively, for a new trial, because they proved their claims of fraudulent transfer and conversion by the great weight of the evidence. We disagree.

## A. STANDARDS OF REVIEW

This Court reviews a trial court's decision on a motion for judgment notwithstanding the verdict de novo. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016). "The appellate court is to review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Id*. (quotation marks and citation omitted).

This Court reviews a trial court's denial of a motion for a new trial for an abuse of discretion. *Allard v State Farm Ins Co*, 271 Mich App 394, 406; 722 NW2d 268 (2006). "[A]n abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007). "When a party challenges a jury's verdict as against the great weight of the evidence, this Court must give substantial deference to the judgment of the trier of fact," and "[i]f there is any competent evidence to support the jury's verdict, we must defer our judgment regarding the credibility of the witnesses." *Allard*, 271 Mich App at 406-407.

## B. ANALYSIS

As defendants note, plaintiffs' argument does not delineate the standards between a motion for judgment notwithstanding the verdict and a motion for a new trial. Instead, plaintiffs repeatedly assert that they established their claims "by the great weight of the evidence." Plaintiffs' argument fails under either standard.

Regarding a motion for judgment notwithstanding the verdict, if the evidence is such that "reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Hecht*, 499 Mich at 605-606 (quotation marks and citation omitted). "[U]nless a plaintiff's case is wholly lacking evidence on an element of a claim, the jury is allowed to make reasonable inferences from the evidence and make credibility determinations." *Id*. at 606 n 29. Regarding a motion for a new trial, a new trial may be granted on some or all of the issues if "[a] verdict or decision [was] against the great weight of the evidence . . . ." MCR 2.611(A)(1)(e). "The trial court cannot substitute its judgment for that of the factfinder, and the jury's verdict should not be set aside if there is competent evidence to support it." *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 194; 600 NW2d 129 (1999). "It is the jury's responsibility to determine the credibility and weight of the trial testimony. The jury has the discretion to believe or disbelieve a witness's testimony, even when the witness's statements are not contradicted, and we must defer to the jury on issues of witness credibility." *Guerrero v Smith*, 280 Mich App 647, 669; 761 NW2d 723 (2008) (citations omitted).

Beginning with plaintiffs' conversion claim, "[c]onversion, both at common law and under the statute, is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Magley v M & W Inc*, 325 Mich App

307, 314; 926 NW2d 1 (2018) (quotation marks and citation omitted).  MCL 600.2919a(1)(a) and (b) provide:

>       (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

>       (a) Another person's stealing or embezzling property or converting property to the other person's own use.

>       (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Therefore, in addition to proving the common-law elements of conversion, to prove statutory conversion, a party must satisfy the additional element "that the conversion was to the other person's own use." *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 337, 357; 871 NW2d 136 (2015) (quotation marks omitted).  "[S]omeone alleging conversion to the defendant's 'own use' under MCL 600.2919a(1)(a) must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Id*. at 359.

At trial, Mauro testified that numerous items were missing from the golf course that were listed on the appraisal summary, and opined that because Marrocco was responsible for operating the golf course, he was the one who converted the property.  However, Mauro admitted that he did not have further evidence that Marrocco took the property.  Mauro was also subject to cross-examination regarding several items with similar descriptions to the missing property that were later sold at an auction after the assignment.  Bauer testified that he never witnessed Marrocco remove items from the golf course during the ABC proceedings and that several items of property had remained on the premises.  Bauer also denied having to purchase used equipment to replace the allegedly converted items.

Based on the testimony presented, reasonable jurors could have honestly reached different conclusions regarding whether Marrocco committed a "distinct act of domain wrongfully exerted over [plaintiffs'] personal property . . . ."  *Magley*, 325 Mich App at 314 (quotation marks and citation omitted).  Mauro's only evidence that Marrocco took the property was the fact that Marrocco was in charge of the golf course during the ABC proceedings.  Further, Bauer provided conflicting testimony that much of the contested property remained on the premises.  Because "reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Hecht*, 499 Mich at 605-606 (quotation marks and citation omitted).

Nor was the jury's verdict against the great weight of the evidence, given that the evidence of conversion was circumstantial and rested predominately on credibility determinations as to the testimony of Mauro and Bauer.  Plaintiffs' argument largely rests on the fact that many of the missing assets Mauro testified about were not rebutted by contrary testimony.  This position

ignores that "[t]he jury has the discretion to believe or disbelieve a witness's testimony, even when the witness's statements are not contradicted, and [this Court] must defer to the jury on issues of witness credibility." *Guerrero*, 280 Mich App at 669 (citations omitted).

As for plaintiffs' claims of fraudulent transfer, "The [Michigan Uniform Fraudulent Transfer Act, MCL 566.31 *et seq*.,] defines two species of fraudulent transfers. The first encompasses transfers made '[w]ith actual intent to hinder, delay, or defraud' a creditor and applies to transfers made either before or after the creditor's claim arose." *Dillard v Schlussel*, 308 Mich App 429, 446; 865 NW2d 648 (2014) (second alteration in original), quoting MCL 566.34(1)(a). MCL 566.34(1) provides,

> (1) Except as otherwise provided in subsection (4), a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following circumstances:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
>
> (*i*) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (*ii*) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The second species of fraudulent transfers is commonly referred to as fraud in law or constructive fraud, which

> deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent. It applies only to transfers made after the creditor's claim arose. Three elements of proof are required: (1) the creditor's claim arose before the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer, and (3) the debtor did not receive "reasonably equivalent value in exchange for the transfer . . . ." [*Dillard*, 308 Mich App at 446, quoting MCL 566.35(1).]

Plaintiffs' claims were premised on three allegedly fraudulent transfers: (1) a $2,000 increase in monthly rent payments from CGI to CGP, (2) a $1,000 monthly management fee paid to a business that Marrocco owned, and (3) an alleged payment to Jode of its outstanding portion of the 2018 judgment. Fanelli offered testimony on these points, stating that the increased rent was part of the "ordinary course of business increases." Fanelli denied increasing the rent as an effort to avoid paying creditors, stating that it was a joint decision between himself and his accountant. As for the monthly management fee, Fanelli testified that he and Marrocco began

collecting the fee through Evergreen Meadows in 2011, as minimal compensation for taking a more hands-on management role at the golf course following staff changes. In 2016, when Marrocco became the primary manager of the golf course, he began collecting the payment through his own company, Evergreen Management. Finally, Fanelli testified that Jode did not receive any judgment payments through the assignment, and that he and Marrocco did not name Jode as a creditor in the ABC proceedings for business reasons.

Based on the foregoing testimony, reasonable minds could differ regarding whether Marrocco and Fanelli made transfers with an "actual intent to hinder, delay, or defraud" plaintiffs under MCL 566.34(1)(a), or made transfers "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" under MCL 566.34(1)(b) and MCL 566.35(1). Fanelli's testimony regarding the purposes for the contested transfers could cause a reasonable juror to find that defendants did not have the requisite intent to defraud, and that they were receiving a reasonably equivalent value in exchange for their management of the golf course. To the extent that plaintiffs contest this testimony, "the jury is allowed to make reasonable inferences from the evidence and make credibility determinations." *Hecht*, 499 Mich at 606 n 29.

The same principles regarding credibility apply to a motion for a new trial. See *Guerrero*, 280 Mich App at 669 (noting it is the jury's responsibility to determine the weight and credibility of testimony). While plaintiffs argue that the trial court "should have inferred" that the missing CGI books and records would be adverse to defendants, those considerations were not for the trial court to determine because "[t]he trial court cannot substitute its judgment for that of the factfinder . . . ." *Ellsworth*, 236 Mich App at 194. The jury was presented testimony from Mauro that the CGI records were missing from the premises, and was free to "believe or disbelieve [Mauro's] testimony." *Guerrero*, 280 Mich App at 669.

For the foregoing reasons, the trial court properly denied plaintiffs' motion for directed verdict or for a new trial with respect to their conversion and fraudulent-transfer claims.

## IV. CASE-EVALUATION SANCTIONS

On cross appeal, defendants argue that the trial court erred by denying their request for case-evaluation sanctions because the former MCR 2.403(O) is applicable and the trial court failed to evaluate whether application of the former rule would work an injustice on defendants. We disagree.

### A. STANDARDS OF REVIEW

This Court reviews a trial court's decision on whether to apply a former court rule under MCR 1.102 for an abuse of discretion. *Webster v Osguthorpe*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket Nos. 166627 & 166628); slip op at 11. "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. A trial court necessarily abuses its discretion when it makes an error of law." *Id*. at ___; slip op at 12 (quotation marks and citations omitted).

### B. ANALYSIS

-11-

Defendants maintain that they are entitled to case-evaluation sanctions because under MCR 1.102, application of the former MCR 2.403(O) is warranted. The Michigan Supreme Court recently discussed the amendments to MCR 2.403, which governs case evaluation. See *Webster*, ___ Mich at ___; slip op at 4-5. MCR 2.403 previously required that attorney fees and costs be imposed as case-evaluation sanctions in certain circumstances, providing:

> If a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation. However, if the opposing party has also rejected the evaluation, a party is entitled to costs only if the verdict is more favorable to that party than the case evaluation. [Former MCR 2.403(O)(1).]

MCR 2.403 was then amended, effective January 1, 2022. *Webster*, ___ Mich at ___; slip op at 5. "Significantly, MCR 2.403(O) was fully removed, such that case-evaluation sanctions can no longer be imposed on parties who reject case-evaluation awards." *Id*. at ___; slip op at 5. MCR 1.102 details the circumstances under which a court may apply a previous version of a court rule in a particular case:

> These rules take effect on March 1, 1985. They govern all proceedings in actions brought on or after that date, and all further proceedings in actions then pending. A court may permit a pending action to proceed under the former rules if it finds that the application of these rules to that action would not be feasible or would work injustice.

In *RAD Constr, Inc v Davis*, 347 Mich App 716, 735; 16 NW3d 328 (2023), overruled in part by *Webster*, ___ Mich at ___; slip op at 10, this Court reversed and vacated a trial court's postamendment award of case-evaluation sanctions, reasoning that "the trial court had no authority to sanction RAD after January 1, 2022." However, *Webster* recently clarified that "[t]o the extent that *RAD Constr* suggests that the trial court did not have the authority to apply the former version of the rule, it is overruled." *Webster*, ___ Mich at ___; slip op at 10. The *Webster* Court then adopted the analysis announced in *Reitmeyer v Schultz Equip & Parts Co, Inc*, 237 Mich App 332; 602 NW2d 596 (1999), for determining whether a current or former court rule should apply, reasoning that "an individualized determination guided by the nonexhaustive factors from *Reitmeyer*—including timing, purpose of the newly adopted rule, possible gamesmanship, and reliance—is appropriate given that these factors bear on whether injustice would occur." *Webster*, ___ Mich at ___; slip op at 10.

In *Reitmeyer*, 237 Mich App at 345, this Court held,

> [W]hile we agree that the "injustice" exception to MCR 1.102 must be applied narrowly and with restraint, such that the exception does not subsume the rule itself, we find that a decision under MCR 1.102 requires an individual determination in this (and in every) case whether such "injustice" would result from the application of the amended version of [a court rule]. This determination should be based on the substance of the rule involved and the timing of plaintiff's actions, plaintiff's obvious gamesmanship or lack thereof, and thus plaintiff's reliance or

lack of reliance on the rules as they existed at the time he made the pertinent decisions in this case, and any other pertinent factors in the individual case.

Based on these principles, the trial court did not abuse its discretion in denying defendants' request for case-evaluation sanctions. The trial court did not appear to rely on the erroneous holding in *RAD Constr*, or claim that it lacked authority to award case-evaluation sanctions. Instead, it determined that "sanctions are not appropriate *in this case*." In rejecting defendants' argument, the court noted the timing of MCR 2.403's amendment in January 2022, which was long before the April 2023 trial. The court reasoned that, other than defendants' claim that they were relying on the old rule, there was nothing "that provides the basis under the rule that says there's a manifest injustice," and noted that "[e]verybody knew what was happening going to trial, including the fact that there were no case evaluation sanctions."

The trial court's reasoning sufficiently evaluated the factors discussed in *Reitmeyer*, particularly the timing of the parties' actions, the lack of reliance on the former rule, and defendants' knowledge of the amendment prior to trial. Therefore, the trial court did not abuse its discretion when declining to apply former MCR 2.403(O), and denying defendants' request for case-evaluation sanctions.

## V. CONCLUSION

We affirm the trial court's May 23, 2022 order partially granting summary disposition in favor of defendants and affirm the trial court's December 13, 2023 order denying plaintiffs' motion for judgment notwithstanding the verdict. We also affirm the trial court's February 5, 2024 order denying defendants' motion for case-evaluation sanctions. Neither party having prevailed in full, no taxable costs are awarded. MCR 7.219(A).

/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello
/s/ Thomas C. Cameron

-13-